LUDINGTON SERVICE CORPORATION v COMMISSIONER OF
INSURANCE

Docket No. 129072. Submitted March 11, 1992, at Lansing. Decided
May 18, 1992, at 9:05 A.M.

Ludington Service Corporation, a wholly owned subsidiary of
Ludington Savings Bank, brought an action in the Ingham
Circuit Court against the Commissioner of Insurance, seeking
declaratory and injunctive relief after the commissioner issued
a declaratory ruling opposing its acquisition and operation of
an insurance agency. The commissioner determined that the
operation of the agency, as proposed in a submitted business
plan, would lead to several violations of the Insurance Code
and eventual revocation of the insurance agency's license. The
court, Thomas L. Brown, J., affirmed the commissioner's ruling.
Ludington Service appealed.

The Court of Appeals *held*:

The Commissioner of Insurance erred in determining that
Ludington Service's proposed operation of the insurance agency
would lead to violations of the Insurance Code.

1. MCL 500.1207(3); MSA 24.11207(3), which prohibits insur-
ance agents from rewarding or remunerating others for procur-
ing insurance business or for furnishing leads or prospects,
would not be violated merely because Ludington Savings Bank,
as the owner of Ludington Service Corporation, will receive
dividends based on the profits earned by the insurance agency.
Section 1207(3) prohibits the payment of referral fees and does
not prohibit a holding company from promoting a subsidiary's
insurance business.

2. MCL 500.1207(5); MSA 24.11207(5), which prohibits the
sale of insurance by means of intimidation or threats, including
the promise to lend money or the threat not to lend money,
would not be violated in this case just because bank customers,
upon being informed of the ties between the bank and the
insurance agency, might feel intimidated or compelled to pro-
cure insurance from the agency in order to receive favorable
treatment from the bank. The business plan gave no indication
that intimidating or coercive practices will be employed.

3. MCL 500.1242(3); MSA 24.11242(3), which authorizes the

commissioner to refuse to grant or renew a license upon a determination that the business or primary occupation of the applicant will give rise to coercion or other prohibited practices in the sale of insurance, cannot serve as a basis for the commissioner's ruling in this case in the absence of evidence of probable coercion or illegal acts by Ludington Service.

4. MCL 500.2077(3); MSA 24.12077(2), which prohibits mortgagees or secured creditors from disclosing a requirement that the borrower obtain insurance on the collateral, where such disclosure would be to the advantage of the lender or to the detriment of the borrower, would not be violated in this case merely because Ludington Savings Bank intends to notify all its customers, some of whom might be its own mortgagees or potential mortgagees, of the bank's association with the insurance agency. The business plan expressly precluded the use of such information. Furthermore, § 2077(2) prohibits the disclosure or use of such information, neither of which will occur in this case.

Reversed.

SHEPHERD, P.J., concurring in the result, disagreed with the conclusions that *THM, Ltd v Comm'r of Ins,* 176 Mich App 772 (1989), which supported part of the insurance commissioner's ruling, was wrongly decided and that the subjective beliefs of insurance customers have no bearing in the determination whether an insurance agent has coerced or intimidated customers.

CONNOR, J., dissenting, stated that the commissioner's ruling should be affirmed because there is competent evidence supporting the commissioner's conclusion that violations of the Insurance Code, particularly the provisions proscribing coercion, will probably occur under the circumstances of this case.

*Honigman Miller Schwartz & Cohn* (by *John D. Pirich, Timothy Sawyer Knowlton,* and *Frederick D. Doherty, Jr.*), for Ludington Service Corporation.

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, and *Harry G. Iwasko, Jr.,* and *William A. Chenoweth,* Assistant Attorneys General, for Commissioner of Insurance.

*Zagaroli, Colpean & Venuto, P.C.* (by *Michael A.*

*Zagaroli, John C. Colpean,* and *Frank R. Venuto),* for Independent Insurance Agents of Michigan, Michigan Association of Professional Insurance Agents, and Michigan State Association of Life Underwriters.

Before: SHEPHERD, P.J., and SAWYER and CONNOR, JJ.

SAWYER, J. Plaintiff appeals from an order of the circuit court affirming a declaratory ruling of the Commissioner of Insurance. The commissioner ruled that the proposed plan submitted by plaintiff to purchase and operate an insurance agency would violate the Insurance Code and result in revocation of the agency's license. We reverse.

Ludington Savings Bank (LSB) is a federally chartered savings and loan institution located in Ludington. It desires to purchase an existing insurance agency in Ludington through a wholly owned subsidiary, plaintiff Ludington Service Corporation. Plaintiff sought this declaratory ruling from the commissioner to determine if the commissioner would oppose the acquisition and operation of the agency by plaintiff in accordance with plaintiff's proposed business plan. The commissioner found that if plaintiff operated the agency in accordance with the plan, it would violate a number of sections of the Insurance Code. Presumably, in such a case, the commissioner would revoke the agency's license or impose such other sanctions as the code might allow.

We turn first to plaintiff's argument that the commissioner has erroneously interpreted the Insurance Code. We agree. In the declaratory ruling, the commissioner stated that plaintiff's proposed business plan violated §§ 1207(3), 1207(5), 1242(3), and 2077(2) of the Insurance Code, being MCL

500.1207(3); MSA 24.11207(3), MCL 500.1207(5); MSA 24.11207(5), MCL 500.1242(3); MSA 24.11242(3), and MCL 500.2077(2); MSA 24.12077(2), respectively. We are not persuaded that plaintiff would necessarily violate the code if the agency is operated according to the business plan.

Turning first to § 1207(3), that section provides as follows:

> Except as provided in section 1212 and subsection (4), an agent shall not reward or remunerate any person for procuring or inducing business in this state, furnishing leads or prospects, or acting in any other manner as an agent.

The commissioner found, in essence, that this section of the Insurance Code would be violated if LSB were to promote business for the agency, because any profits of the agency would be distributed to LSB as owner.[1]

Although the commissioner's position is supported by this Court's decision in *THM, Ltd v Comm'r of Ins,* 176 Mich App 772; 440 NW2d 85 (1989), we believe that case was not correctly decided. Section 1207(3) prohibits the payment of a reward or remuneration by an agent to another person for procuring business, furnishing leads, and so forth. We do not read § 1207(3) as prohibiting the payment of profits or dividends to a hold-

---

[1] Specifically, the commissioner's findings of fact and conclusions of law include the following:

3. According to the Plan, LSB will make informational mailings and disseminate information to its customers and the general public with respect to the availability of insurance services from the Agency. If the Agency is profitable, those profits will inure directly or indirectly to the benefit of LSB through the payment of dividends by the Agency.

4. This arrangement will violate Section 1207(3) because, by dividend payments, it will reward LSB for inducing or procuring business and providing leads or prospects.

ing company if the holding company also engages in the general business promotion of its subsidiary. Rather, § 1207(3) prohibits the payment of a referral fee, i.e., a quid pro quo payment to an individual for the referral of a client.

This issue was discussed in *Lawyers Title Ins Corp v Chicago Title Ins Co,* 161 Mich App 183; 409 NW2d 774 (1987), which was relied upon by the *THM* Court. In *Lawyers Title,* the plaintiff was a title insurance company that sold insurance through exclusive arrangements with agencies that were owned by real estate brokers. The brokers would refer all of their real estate customers to the broker-owned agencies to procure title insurance from the plaintiff. This Court affirmed the commissioner's finding of a violation of § 1207(3) based upon the referral of business and payment of dividends to the broker-owners of the title companies. It is important, however, to look closely at the basis for this Court's decision.

First, this Court specifically noted that the stock in the agencies "was originally distributed to reflect the amount of business each broker would refer." *Lawyers Title, supra* at 193. The Court also rejected the argument that the commissioner's position would prohibit "all closely held title corporations whose shareholders would naturally refer their associates to their corporation and, in turn, receive dividends." *Id.* The Court also considered the argument that § 1207(3) prohibits only the payment of referral fees, holding as follows:

> The other respondents also claim that § 1207(3) was only intended to apply to monetary rewards for referrals to persons who are not licensed insurance agents and not to forbid distribution of bona fide corporate dividends. Respondents fail to point out that the corporate dividends which they characterize as bona fide were also found by the com-

missioner to be a reward or remuneration for their
shareholder-brokers to procure business. We fur-
ther agree with the commissioner that the fact
that the brokers might not receive dividends in
direct proportion to their referrals is irrelevant
under § 1207(3). The important facts are that the
brokers were receiving dividends from respondents
for procuring title insurance business and that
*they were receiving these dividends for the
amount of title insurance business they were ex-
pected to refer.* [*Lawyer's Title, supra* at 193-194;
emphasis added.]

Thus, in *Lawyers Title,* the basis for finding a
violation of § 1207(3) was not just the fact that
shareholders sent business to the agency and re-
ceived dividends. Rather, the structure of the own-
ership of the agencies and the payment of divi-
dends were designed to recompense the share-
holder-brokers in proportion to the amount of
business to be referred by those shareholder-bro-
kers. There is no indication in the case at bar that
the dividends to be paid to LSB will be dependent
upon, and proportionate to, the amount of business
referred to the agency by LSB.

The statute does not permit an agent to "re-
ward" or "remunerate" another person. *The Ran-
dom House College Dictionary* (rev ed), defines
"reward" as follows:

1. something given or received in return for
service, merit, etc. . . . . 3. to recompense or requite
(a person or animal) for service, merit, achieve-
ment, etc. 4. to make return for or requite (service,
merit, etc.); recompense.

Similarly, "remunerate" is defined as:

1. to pay, recompense, or reward. 2. to yield a
recompense for.

Where a term is not defined by the statute, it is appropriate to look to the dictionary definition of the word. *United Southern Assurance Co v Aetna Life & Casualty Ins Co,* 189 Mich App 485, 489; 474 NW2d 131 (1991). The terms "reward" and "remunerate" encompass the payment of money to compensate for a service rendered, not the payment of profits to an owner of a company as a return on investment. Thus, § 1207(3) prohibits the payment of referral fees and does not apply to prohibit a holding company from promoting a subsidiary insurance agency's business.

In sum, § 1207(3) is not violated where an agency pays a dividend to a shareholder based upon the profits earned by the agency and the shareholder engages in promotion of the insurance agency. Rather, a violation would occur only if the shareholder is specifically remunerated for business provided by the shareholder to the agency without regard to the general profitability of the agency, or if the ownership of the agency and profit distribution are structured in such a manner as to make a profit distribution directly dependent on the referral of business by the shareholder to the agency.

Next, the commissioner opined that operating the agency according to LSB's business plan would violate § 1207(5), which provides as follows:

A person may not sell or attempt to sell insurance by means of intimidation or threats, whether express or implied. Except as provided in section 2077(4) a person may not induce the purchase of insurance through a particular agent or from a particular insurer by means of a promise to sell goods, to lend money, to provide services, or by a threat to refuse to sell goods, to refuse to lend money, or to refuse to provide services.

The commissioner also determined that there would probably be a violation of § 1242(3), which provides as follow:

> After notice and opportunity for a hearing, the commissioner may refuse to grant or renew a license to act as an agent, solicitor, adjuster or insurance counselor if he determines by a preponderance of the evidence, that it is probable that the business or primary occupation of the applicant will give rise to coercion, indirect rebating of commissions or other practices in the sale of insurance which are prohibited by law.

The "Disclosure" section of the business plan specifically provides for informing customers that purchasing insurance through the agency will not affect the decision to grant credit either favorably or unfavorably.[2] Despite these provisions of the business plan, the commissioner nevertheless determined that a violation of §§ 1207(5) and 1242(3) would likely occur:

> 7. According to the Plan, LSB will make informational mailings to its borrowers and the general public with respect to the availability of insurance services from the Agency and with respect to the affiliation between LSB and the Agency. These mailings will promote a perception among borrowers that loans from LSB are tied to insurance sales. If the mailings are done with frequency to LSB customers, some customers will receive promotional literature at the same time they are making applications for new loans.

---

[2] The business plan provides as follows:
The Savings Bank will disclose to customers in writing that purchase of insurance from the Service Corporation Agency:
1. is optional, and customers are free to obtain insurance from other sources.
2. will not favor or disfavor any past, present, or future application for credit in any way whatsoever.

8. Under this arrangement, it is probable that the sale of insurance by the Agency, as promoted by LSB, will give rise to coercion and be in violation of Section 1242(3) and give rise to implied threats to refuse to lend money in violation of Section 1207(5).

Again, we see no probable violation of these sections of the Insurance Code. Considering first § 1207(5), that section prohibits the use of threats or intimidation to sell insurance. However, nothing in the business plan calls for LSB or the agency to employ threats or intimidation to sell insurance. Rather, the commissioner's concerns seem focused on the prospect that bank customers will feel intimidated or think that it is necessary or helpful to obtaining credit from the bank to purchase insurance through the agency. At most, this means that some customers might infer a threat from being informed of the connection between LSB and the agency.

It is conceivable, of course, that some bank customers might believe it necessary or helpful to purchase insurance through the agency and that the failure to do so might result in LSB refusing to extend credit despite LSB's representations to the contrary. We do not believe, however, that § 1207(5) focuses on the subjective beliefs, reasonable or unreasonable, of the customer. Rather, it focuses on the conduct of the insurance salesman. It prohibits a person endeavoring to sell insurance or to induce the sale of insurance through a particular agent from using intimidation, threats, or certain promises. These are all affirmative acts. Thus, in determining whether a violation of § 1207(5) exists, the conduct at issue must be viewed from the perspective of the insurance agent, rather than the customer, to determine whether the agent intimidated, threatened, or

made improper promises. Thus, the issue here is not whether a bank customer might feel it helpful to purchase insurance through LSB's agency, but whether LSB is encouraging that belief by telling its customers, either expressly or by implication, that it is necessary to purchase insurance through the agency in order to get favorable treatment by the bank.

As stated above, nothing in the business plan indicates that LSB intends to do this. The commissioner erred in determining that merely informing customers of the connection between LSB and the agency is an intimidating or threatening tactic. Rather, the manner in which LSB informs its customer (i.e., what statements are made), as well as what other conduct LSB engages in to promote its insurance agency, may be reviewed by the commissioner. If any such conduct is shown to employ intimidation, threats, or promises, the commissioner may address the violation accordingly. However, the commissioner should not presume LSB guilty until proven innocent.

As for the related concerns with respect to § 1242(3), which permits the commissioner to refuse to grant or renew a license if a preponderance of the evidence establishes "that it is probable that the business or primary occupation of the applicant will give rise to coercion," the analysis is essentially the same as that for § 1207(5). Nothing in the business plan indicates an intent by LSB to engage in coercive tactics. Moreover, the argument that it is inherently coercive to allow a bank to own an insurance agency must fail in light of the commissioner's own admission that banks have, in fact, been allowed to own insurance agencies. The commissioner's admission of this fact means that the issue must be examined case by case; nothing in this case indicates the existence, or intended

use, of coercion. Of course, the activities of LSB and its agency will be subject to the continuing scrutiny of the commissioner and, if the facts support it, the commissioner could at some future time refuse to renew the agency's license under § 1242(3).

The final section of the Insurance Code the commissioner determined would be violated by LSB's business plan is § 2077(2), which prohibits the disclosure of certain real estate mortgage information to insurance agents. Section 2077(2) provides as follows:

> If an instrument requires that a purchaser, mortgagor or borrower furnish insurance of any kind on real property being conveyed or which is collateral security to a loan, the vendor, mortgagee or lender shall refrain from using or disclosing any such information to his own advantage or to the detriment of the purchaser, mortgagor, borrower, insurance company or agency complying with such requirement.

The business plan contains no provisions stating that LSB will make use of such information.[3] In fact, it contains provisions that explicitly preclude the use or disclosure of such information. The commissioner, however, takes the position that

[3] The commissioner determined that LSB's business plan would violate these provisions for the following reasons:

5. According to the Plan, LSB will make informational mailings to persons who secure mortgages from LSB. LSB will obtain the names and addresses of these persons through the mortgage process. The Agency will sell insurance that is required in connection with the mortgages. The informational mailings will promote the sale of this required insurance by the Agency. If the Agency is profitable, those profits will inure, directly or indirectly, to the benefit of LSB.

6. This arrangement will violate Section 2077(2) since, with respect to required insurance on real property which is collateral security to a loan, LSB will use information, including names and addresses, to its own advantage.

any general mailings by LSB to all of its customers would nevertheless violate § 2077(2) because some customers will be mortgage customers who are required to have insurance. We disagree.

First, there is the question of exactly what information a lender is precluded from disclosing under § 2077(2). The statute itself refers to instruments that require the borrower to furnish insurance on real property pledged as collateral for a loan and prohibits the lender from "using or disclosing any such information" to his advantage or to the detriment of the purchaser, borrower, mortgagor, insurance company, or agency complying with "such requirement." Thus, by its terms, the only "information" mentioned in the statute is the information that the borrower is required to furnish insurance. That is, a lender is only precluded under the statute from disclosing the existence of a mandatory insurance requirement.

Of course, as pointed out by the Michigan Bankers Association in its amicus brief and not disputed by the commissioner, every mortgage requires the borrower to insure the property and, thus, insurance agents can, and do, solicit homeowners for their business. Further, as pointed out in Michigan Bankers' amicus brief, mortgages are public records and, therefore, any insurance agent can determine who is a mortgagor and what is the anniversary date of the mortgage (the most likely time for the expiration of the existing insurance policy).

Thus, the disclosure of the existence of the insurance clause in an existing mortgage would not seem to be a basis for finding a violation of the statute because this information is in the public domain anyway. One cannot take an unfair advantage from information known to the public. However, what is not public information is the applica-

tion for a mortgage and the fact that the applicant will have to procure insurance to obtain the mortgage. Thus, LSB could be in a position to improperly exploit this information to solicit business on behalf of the agency from mortgage applicants whose status is not yet in the public records.

The business plan indicates that LSB will not make use of this information to solicit insurance business. However, from the commissioner's viewpoint, a violation of § 2077(2) would still be caused by general mailings to LSB's customers because it is likely that some of those customers would be in the process of obtaining a mortgage from LSB when they received an insurance solicitation. However, § 2077(2) prohibits only the use of the information of the insurance requirement. By mailing to general customers, rather than to mortgage applicants, the information is not, in fact, being used.[4]

For the above reasons, we conclude that the commissioner erred in determining that the business plan would violate the Insurance Code. In light of our conclusion above, we need not address plaintiff's remaining challenges, which were based upon constitutional and federal preemption theories, to the commissioner's ruling.[5]

Reversed. Plaintiff may tax costs.

SHEPHERD, P.J. *(concurring).* I concur in the

---

[4] A potential violation of § 2077(2) does exist if LSB places on its mailing list an individual who applies for a mortgage and who has no prior relationship with LSB and, thus, would receive the mailing only because of his mortgage application. It is not clear to us that this would be a violation because it would still be part of a general mailing. However, even if it is, compliance with the statute could be easily obtained by LSB merely by refraining from adding to the mailing list until after the mortgage closes those mortgage applicants who are not already on the list.

[5] We reject plaintiff's argument that the commissioner erred in applying the decision in *THM* without first promulgating a rule. There is no requirement that an agency promulgate a rule before following a court decision.

result but write separately for two reasons. First, I do not agree that *THM, Ltd v Comm'r of Ins,* 176 Mich App 772; 440 NW2d 85 (1989), was wrongly decided. The decision in that case was based upon the business plan that had been submitted to the Commissioner of Insurance. I concurred in that opinion because I believed that competent, material, and substantial evidence supported the commissioner's conclusion that the business plan would violate MCL 500.2077(2); MSA 24.12077(2), which precludes a mortgage lender from using information relating to a customer's insurance needs to its advantage or to the detriment of the borrower. I am satisfied that the business plan submitted by plaintiff in this case sufficiently addresses the concerns raised in *THM.*

Secondly, I do not agree with the statement in the majority opinion that the subjective beliefs, reasonable or unreasonable, of the customers have no bearing on whether the customer was subjected to intimidating, threatening, or coercive action. Certainly an unreasonable belief of the customer cannot form the basis of a claim that the insurance agency engaged in coercive activity. However, a reasonable subjective belief by the customer of intimidation, if such reasonable belief is based upon specific acts of the insurance agency or the financial institution, should in my view be considered in determining whether coercion actually occurred. Such unlawful acts would include violations of the business plan.

Connor, J. *(dissenting).* Historically the courts have given great credence to agency expertise and the Court of Appeals would not substitute its judgment for that of the Commissioner of Insurance if competent evidence supported the commissioner's findings. *Auto Club Ins Ass'n v Comm'r of*

*Ins,* 144 Mich App 525, 529-531; 376 NW2d 150 (1985).

The Legislature has provided that the Insurance Bureau may refuse to grant a license to sell insurance if the commissioner finds it is "probable" that violations will occur. MCL 500.1242(3); MSA 24.11242(3).

In this case, the commissioner made several detailed findings of fact and conclusions of law, including the following: "[I]t is probable that the sale of insurance by the agency, as promoted by LSB, will give rise to coercion and be in violation of § 1242(3) and give rise to implied threats to lend money in violation of § 1207(5)."

The majority opines that the commissioner erred in determining that informing customers of the connection between LSB and the agency is an intimidating or threatening tactic because "[t]he 'Disclosure' section of the Business Plan specifically provides for informing customers that purchasing insurance through the agency will not affect the decision to grant credit either favorably or unfavorably."

I believe the insurance commissioner's finding that LSB's business plan would probably violate § 1207(5) should be affirmed by this Court. Section 1207(5) provides in part that a person may not attempt to induce the purchase of insurance through a particular agent by means of an implied threat to refuse to lend money or by means of an implied promise to lend money.

It is not clear from the business plan who may solicit, when they may solicit, and where they may solicit. I believe the commissioner could reasonably conclude that an on-site insurance agency would "probably" lead to coercive action. Merely disavowing the intent to punish applicants who fail to purchase their insurance from the bank's insur-

ance agency may not be sufficient to overcome the
clear impression an applicant may have to the
contrary because of dual ownership. Indeed, the
disclaimer may serve to reinforce the fear. Steady
customers who must periodically rely on financial
institutions for credit certainly perceive the desir-
ability of maintaining a cordial relationship with
their bank, and it would be reasonable to conclude
that their best interests are served by purchasing
insurance from the lender's insurance agency.

While it is not inherently incompatible for a
bank to own an insurance agency, the lines of
demarcation must be carefully drawn to avoid
abuse, and this Court must defer to the commis-
sioner's expertise if a factual question is presented.
In this case, the bank anticipated that insurance
agents would conduct business inside the bank in
areas traditionally reserved for the bank's daily
financial activity. Under these circumstances, I
believe the commissioner could reasonably con-
clude that abuses were probable; indeed, they seem
inevitable.

I would affirm.