LUDINGTON SERVICE CORPORATION v
ACTING COMMISSIONER OF INSURANCE

Docket Nos. 95123, 95124. Argued November 3, 1993 (Calendar
No. 9). Decided January 25, 1994.

Ludington Service Corporation, a wholly owned subsidiary of
Ludington Savings Bank, brought an action in the Ingham
Circuit Court against the Acting Commissioner of Insurance,
seeking a declaratory ruling regarding whether its proposed
business plan to purchase and operate an existing insurance
agency would violate the Insurance Code. The court, Thomas L.
Brown, J., dismissed the suit on the ground that the plaintiff
had not exhausted all of its administrative remedies. There-
after, the plaintiff sought a declaratory ruling by the commis-
sioner, but subsequently filed a second suit in the circuit court.
Thereafter, the commissioner issued a declaratory ruling, find-
ing that the business plan would violate several sections of the
Insurance Code, and filed it and an answer with the circuit
court. The court affirmed the commissioner's ruling. The Court of
Appeals, SAWYER, J. (SHEPHERD, P.J., concurring), and (CONNOR,
J., dissenting), reversed (Docket No. 129072). The commissioner
appeals.

In a unanimous opinion by Justice RILEY, the Supreme Court
held:

The Commissioner of Insurance lacked the necessary compe-
tent, material, and substantial evidence to support his findings
of violations of §§ 1207(3), 2077(2), and 1207(5) of the Insurance
Code. The commissioner additionally erred as a matter of law
in applying § 1242(3), because that section is limited to the
granting or renewing of a license, as opposed to the acquisition
of a licensed insurance agency.

1. A decision of the Commissioner of Insurance must be
upheld if it is supported by such evidence as a reasonable mind
would accept as adequate to support the decision. The office of
the Commissioner of Insurance is an administrative agency
charged with executing the laws relating to insurance and
performing such other duties as may be required by law.
Accordingly, great deference will be accorded the commission-
er's factual findings and construction of statutory provisions.

2. Section 1207(3) of the Insurance Code prohibits an insur-

ance agent from rewarding or remunerating anyone for procuring or inducing business or furnishing leads or prospects. In this case, however, the record is devoid of any competent, material, and substantial evidence necessary to support a violation of § 1207(3); the commissioner has yet to determine how much business will ensue directly or indirectly from bank referrals, nor has he pointed to any other evidence or remuneration between the plaintiff and the bank. Absent such evidence, it cannot be said that a kickback scheme as contemplated by § 1207(3) was in place. Furthermore, because the bank seeks to acquire an existing agency, at least some portion of the business will already exist, unconnected to the bank's lending activities. Accordingly, the bank's business plan properly shields its lending activities from its subsidiary's insurance activities.

3. The record fails to demonstrate the necessary competent, material, and substantial evidence supporting a violation of § 2077(2). Section 2077(2) proscribes a lender from using information with regard to required insurance to its own advantage or to the mortgagor's detriment. However, the bank's generalized and untargeted informational mailing to all customers would not exploit the bank's knowledge that a specific borrower must have insurance as a condition of a loan. Absent direct targeting via mailings, the business plan cannot be said to violate § 2077(2).

4. Section 1207(5) prohibits a bank from threatening or intimidating its customers to purchase insurance from a particular agent or insurer in relation to the lending of money. Here again the record lacks the necessary competent, material, and substantial evidence to support a violation. The business plan at issue clearly implements safeguards proscribing conduct with regard to all loan activities that would violate § 1207(5). Further, regulatory controls are available to prevent the inherent pressure and intimidation that customers would endure were a subsidiary of a financial institution to sell insurance to the institution's borrowers.

5. Findings of the Commissioner of Insurance may be set aside if they violate the constitution or a statute or are affected by other substantial and material error of law. In this case, the commissioner erred as a matter of law in basing his decision on § 1242(3), because that section only empowers the commissioner to review the granting and renewing of a license, it does not apply to the acquisition of an existing insurance agency.

Affirmed.

194 Mich App 255; 486 NW2d 120 (1992) affirmed.

*Honigman, Miller, Schwartz & Cohn* (by *John D. Pirich* and *Timothy Sawyer Knowlton*) for the plaintiff.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Harry G. Iwasko, Jr.,* and *William A. Chenoweth,* Assistant Attorneys General, for the defendant.

*Michael A. Zagaroli* for the intervening defendants.

Amicus Curiae:

*Warner, Norcross & Judd* (by *James H. Breay*) for Michigan Bankers Association.

RILEY, J. We granted leave to appeal in this declaratory relief action to decide whether Ludington Savings Bank's proposed business plan to purchase and operate an existing insurance agency through its wholly owned subsidiary, Ludington Service Corporation, would violate the Insurance Code. Specifically, we must decide whether the Commissioner of Insurance erred in concluding that the bank's proposed business plan would violate MCL 500.1207(3); MSA 24.11207(3), MCL 500.2077(2); MSA 24.12077(2), MCL 500.1207(5); MSA 24.11207(5), and MCL 500.1242(3); MSA 24.11242(3). We hold that the commissioner's findings with respect to §§ 1207(3), 2077(2), and 1207(5) are not supported by competent, material, and substantial evidence. We also hold that the commissioner improperly based his ruling on § 1242(3). Accordingly, we affirm the result reached by the

Court of Appeals, albeit on somewhat different grounds.

I

Ludington Savings Bank sought to acquire ownership of an existing insurance agency through its wholly owned subsidiary, Ludington Service Corporation (plaintiff).[1] Plaintiff proposed to offer life, accident, health, annuities, personal and commercial property, and casualty insurance. Both the insurance and banking operations were to take place in the bank buildings. After preparing a business plan[2] that attempted to separate the

---

[1] After filing this case, the bank sold plaintiff's stock to Sturgis Federal Savings Bank. However, the plaintiff still intends to purchase a licensed insurance agency and conform to the business plan disputed in this case, except it would operate in conjunction with Sturgis Bank rather than Ludington Bank. The parties have not argued that this transaction affects the merits or propriety of this appeal. We therefore consider the merits of this appeal as binding on both the plaintiff and the commissioner, regardless of whether it is operated in conjunction with Ludington Savings Bank or Sturgis Federal Savings Bank.

[2] The proposed business plan provided as follows:

(1) The bank would separate lending activities from other banking activities and would not require borrowers to purchase insurance through plaintiff;

(2) While mortgage applications are pending, banking personnel would refrain from mentioning to borrowers that insurance is available from plaintiff. Further, loan personnel would not initiate conversation in regard to the availability of insurance from plaintiff with persons who ask about credit and whose credit application is pending. However, if a loan applicant inquires about insurance, banking personnel may state that insurance is available from plaintiff and inform the customer where to obtain additional information. If this occurs, banking personnel must supply written disclosure to the customer indicating that all insurance and credit transactions are separate and independent from each other, that the customer is free to seek insurance from other agencies, and the customer's decision to purchase or not purchase insurance would not affect his credit application;

bank's lending activities from plaintiff's insurance activities, plaintiff submitted the plan to the office of the Commissioner of Insurance and engaged in informal discussions with agency personnel. Subsequently, however, plaintiff learned that John R. Schoonmaker, the agency's director of legal resources, had sent a letter to Robert G. Howell, Executive Vice-President of the Michigan League of Savings Institutions, indicating that plaintiff's business plan could be in violation of the Insurance Code.[3]

(3) Loan personnel would not be licensed insurance agents;

(4) In loan applications areas, banking personnel would not place signs or other information indicating the availability of insurance from plaintiff;

(5) Where the bank requires insurance as a condition of a loan, both transactions would be effected independently and via separate documents. Further, if the applicant seeks a loan for premiums on required insurance, it would not be included in the primary credit;

(6) If the insurance and lending services are available in one location, each transaction would be handled by different persons. Further, if both services are at the same location, each would be clearly and conspicuously marked and separated from each other;

(7) The bank would not use or disclose any information obtained in its lending activities for the benefit of plaintiff;

(8) The bank could publicly mention its affiliation with plaintiff, and could do so in general bank mailings;

(9) The board of directors of both companies would act separately, but some could serve as directors of both companies. Similarly, officers could serve as representatives of both companies, except that they could not be both licensed insurance agents and loan personnel; and

(10) Dividends would be paid to plaintiff's shareholders solely on the basis of the capital invested and the assumed risks.

[3] Presently, the Michigan House of Representatives is considering a bill to permit financial institutions, savings and loan associations, credit card issuers, and credit unions to sell all forms of insurance. See HB 4020, HB 4022, HB 4727, and HB 4726. Also, HB 4729 would allow institutions that sell secondary mortgages to charge directly or

Plaintiff promptly filed suit in Ingham Circuit Court, seeking a declaratory judgment and requesting approval to operate the insurance agency in accordance with its proposed business plan.[4] Judge Thomas L. Brown dismissed the suit on the ground that plaintiff had not exhausted all its administrative remedies, noting that plaintiff either could seek a declaratory ruling from the commissioner or purchase the agency and contest the revocation proceedings if the commissioner sought to revoke the license.[5]

Following the court's dismissal, plaintiff sought a declaratory ruling by the commissioner with regard to whether he would oppose the acquisition or later seek to revoke the license.[6] At some point, plaintiff apparently concluded that the commissioner was improperly delaying his decision,[7]

---

indirectly for any kind of required or nonrequired insurance. Similarly, HB 4728 would permit loan institutions to deduct insurance premiums from the principals of their loans. All these bills, however, are contingent upon the Legislature adopting each of these amendments.

[4] Plaintiff alleged that the commissioner was predisposed against permitting financial institutions to own insurance agencies. Accordingly, plaintiff argued that any further action with the commissioner would be futile.

[5] Judge Brown further stated that these options were not necessarily futile because the commissioner had previously allowed some affiliation between financial institutions and insurance agencies.

[6] In this request, plaintiff submitted a slightly modified business plan designed to address some of the concerns that had been raised by the commissioner's office.

[7] On July 17, 1989, Mr. Schoonmaker sent a letter to plaintiff's counsel indicating that the commissioner received its request for declaratory ruling. He also informed plaintiff that various organizations were given until July 31, 1989, to comment on its request. Additionally, he stated that the complexity of the issues and the need to consult with the Attorney General "may require a longer time period for issuance of the declaratory ruling than August 14, 1989, which is 90 days after the receipt of your request."

The commissioner apparently complied with the commission regulation in 1985 AACS, R 500.1043 which states:

thereby provoking plaintiff to again file suit in Ingham Circuit Court.

Thereafter, on September 15, 1989, the commissioner issued his declaratory ruling in conjunction with his answer to plaintiff's complaint and filed both with the circuit court. In the declaratory ruling, the commissioner found that plaintiff's business plan would violate several sections of the Insurance Code.[8] Consequently, the commissioner moved for summary disposition on the basis of his findings. After rejecting several constitutional and procedural arguments,[9] Judge Brown affirmed the commissioner's declaratory ruling. Plaintiff appealed Judge Brown's ruling in the Court of Appeals.

In three separate opinions, the Court of Appeals

Rule 3. (1) If the commissioner grants a request for a declaratory ruling, the commissioner shall issue the declaratory ruling within 90 days after receipt of the request, unless the commissioner advises the applicant, in writing, that the complexity of the issue, the need to secure comments from interested persons, or the need to seek the advice of the attorney general requires a longer period of time.

Nonetheless, plaintiff apparently believed that the commissioner was violating MCL 24.264; MSA 3.560(164) of the Administrative Procedures Act requiring the commissioner to act expeditiously, despite that section's failure to specify an exact time limit. See n 11.

[8] The commissioner refused to rule on any future proceedings to revoke plaintiff's license because this prospective determination was beyond the scope of a declaratory ruling. The commissioner explained that § 63 of the Michigan Administrative Procedures Act limits declaratory rulings "to an actual state of facts of a statute administered by the state agency or a rule or order of the agency." Declaratory ruling at 3.

[9] Plaintiff raised various constitutional arguments based on the Supremacy Clause, the Equal Protection Clause, and the First Amendment. Plaintiff also alleged that the commissioner violated the rule-making procedure. The circuit court rejected all of these arguments, and the Court of Appeals did not consider them. We denied leave to appeal these questions and express no opinion with respect to the merits of these contentions.

panel reversed both the commissioner's ruling and the circuit court's opinion. 194 Mich App 255; 486 NW2d 120 (1992). In the lead opinion, Judge SAWYER stated that he was not convinced that "plaintiff would necessarily violate the code if the agency is operated according to the business plan." *Id.* at 258. Judge SHEPHERD concurred in the result reached by Judge SAWYER, but on the ground that the commissioner's ruling lacked competent, material, and substantial supporting evidence. *Id.* at 268. Finally, Judge CONNOR dissented, asserting that the commissioner's decisions are entitled to substantial deference, and therefore, found competent, material, and substantial evidence to support the commissioner's ruling. *Id.* at 268-270.

We granted leave to appeal, as well as various motions for leave to file briefs amici curiae.[10]

II

This case comes to the Court in an interesting procedural posture because, instead of waiting for the commissioner to act upon actual Insurance Code violations, plaintiff exercised its right to a declaratory ruling for advance instruction with respect to whether its proposed business plan would violate the Insurance Code. Essentially, plaintiff sought guidance and approval that would bind the commissioner *before* making a substantial investment in its proposed business venture. Section 63 of the Administrative Procedures Act specifically permits plaintiff to seek such relief.[11]

[10] 443 Mich 868 (1993). As noted earlier, this Court rejected plaintiff's application for leave to appeal as cross appellant on various constitutional and procedural issues. See n 9.

[11] The Administrative Procedures Act provides as follows:

Although this is a permissible remedy, we recognize the difficulty in isolating anticipatory violations of the Insurance Code solely on the basis of a proposed business plan.[12]

Nonetheless, in reviewing the commissioner's findings, both the Michigan Constitution[13] and the

> On request of an interested person, an agency may issue a declaratory ruling as to the applicability to an actual state of facts of a statute administered by the agency or of a rule or order of the agency. An agency shall prescribe by rule the form for such a request and procedure for its submission, consideration and disposition. A declaratory ruling is binding on the agency and the person requesting it unless it is altered or set aside by any court. An agency may not retroactively change a declaratory ruling, but nothing in this subsection prevents an agency from prospectively changing a declaratory ruling. A declaratory ruling is subject to judicial review in the same manner as an agency final decision or order in a contested case. [MCL 24.263; MSA 3.560(163).]

If the agency denies the request or fails to act expeditiously, the aggrieved party is then permitted to immediately seek a declaratory judgment in circuit court. MCL 24.264; MSA 3.560(164). See also Monfils, *Seeking declaratory relief under sections 63 and 64 of Michigan's Administrative Procedure Act,* 1983 Det Col L R 855.

[12] We note the added difficulty in reaching a proper result without conducting a hearing. In *THM, Ltd v Comm'r of Ins,* 176 Mich App 772; 440 NW2d 85 (1989), and *Lawyers Title Ins Corp v Chicago Title Ins Co,* 161 Mich App 183; 409 NW2d 774 (1987), the commissioner conducted a hearing. However, in the instant case, the commissioner did not, presumably because of the declaratory nature of this action.

[13] Const 1963, art 6, § 28 provides in pertinent part:

> All final decisions, findings, rulings and orders of any administrative officer or agency existing under the constitution or by law, which are judicial or quasi-judicial and affect private rights or licenses, shall be subject to direct review by the courts as provided by law. This review shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record.

applicable statute[14] direct this Court to examine the commissioner's authority to issue such a ruling as well as the entire record to determine whether the anticipated violations are supported by competent, material, and substantial evidence. *Metropolitan Council No 23 AFSCME v Oakland Co Prosecutor,* 409 Mich 299, 330; 294 NW2d 578 (1980), quoting *Detroit v General Foods Corp,* 39 Mich App 180, 190; 197 NW2d 315 (1972). This Court must uphold the commissioner's decision " 'if it is supported by such evidence as a reasonable mind would accept as adequate to support the

---

[14] MCL 24.306; MSA 3.560(206) provides the standard of review when a contrary statute or the constitution does not provide a different scope of review:

(1) Except when a statute or the constitution provides for a different scope of review, the court shall hold unlawful and set aside a decision or order of an agency if substantial rights of the petitioner have been prejudiced because the decision or order is any of the following:

(a) In violation of the constitution or a statute.

(b) In excess of the statutory authority or jurisdiction of the agency.

(c) Made upon unlawful procedure resulting in material prejudice to a party.

(d) Not supported by competent, material and substantial evidence on the whole record.

(e) Arbitrary, capricious or clearly an abuse or unwarranted exercise of discretion.

(f) Affected by other substantial and material error of law.

(2) The court, as appropriate, may affirm, reverse or modify the decision or order or remand the case for further proceedings.

Because the Michigan Constitution only sets forth the minimum requirements, the standard of review as enunciated in MCL 24.306; MSA 3.560(206) still governs. Accordingly, simply because the Michigan Constitution sets forth the competent, material, and substantial record standard for agency decisions involving a hearing does not preclude this Court's application of this same standard to the instant case via MCL 24.306; MSA 3.560(206).

decision.' " *Kieffer v Dep't of Licensing & Regulation,* 169 Mich App 312, 315; 425 NW2d 539 (1988).

Moreover, we recognize that the office of Commissioner of Insurance is an administrative agency "charged with the execution of the laws in relation to insurance . . . and to perform such other duties as may be required by law . . . ." MCL 500.200; MSA 24.1200. Accordingly, this Court, in reviewing the record, will accord the commissioner's factual findings great deference. *Breuhan v Plymouth-Canton Community Schools,* 425 Mich 278, 282-283; 389 NW2d 85 (1986), citing *Magreta v Ambassador Steel Co,* 380 Mich 513, 519; 158 NW2d 473 (1968). Similarly, this Court will accord deference to the " 'construction placed upon statutory provisions by any particular department of government for a long period of time . . . .' " *Southfield Police Officers Ass'n v Southfield,* 433 Mich 168, 177; 445 NW2d 98 (1989).

A

Against this backdrop, we review first the commissioner's holding that the bank's plan would violate § 1207(3) of the Insurance Code, which provides:

> Except as provided in section 1212 and subsection (4), an agent shall not reward or remunerate any person for procuring or inducing business in this state, furnishing leads or prospects, or acting in any other manner as an agent.

The commissioner reasoned that the bank's plan would "amount to procuring or inducing business or furnishing leads or prospects for the Agency,"

with profits inuring to the benefit of the bank via dividend payments.[15] Declaratory ruling at 5.

In addressing *THM, Ltd v Comm'r of Ins,* 176 Mich App 772; 440 NW2d 85 (1989), the commissioner stated that the same analysis is applicable in the instant case.[16] He also suggested that this case could result in an even greater violation of § 1207(3) than in *THM.* The commissioner reasoned that the business plan's proposal to permit the bank to control and distribute the mailings, while allowing both companies to inform their customers of their affiliation, would violate § 1207(3)'s prohibition against producing leads or prospects, as well as the prohibition against procuring and inducing business. Declaratory ruling at 6.

---

[15] The commissioner's specific findings and conclusions were as follows:

> 3. According to the Plan, [the bank] will make informational mailings and disseminate information to its customers and the general public with respect to the availability of insurance services from the [plaintiff]. If the [plaintiff] is profitable, those profits will inure directly or indirectly to the benefit of [the bank] through the payment of dividends by the [plaintiff].
> 4. This arrangement will violate Section 1207(3) because, by dividend payments, it will reward [the bank] for inducing or procuring business and providing leads or prospects. [Declaratory ruling at 12-13.]

[16] The commissioner quoted *THM* and inserted brackets for the bank (LSB) and plaintiff (Agency) when applicable.

> The facts of that case [*Lawyers Title* (n 12 *supra*)] are similar to this case. D&N [LSB] is a sole shareholder of plaintiff [Agency]. D&N [LSB] would profit from plaintiff's [Agency's] success because D&N [LSB] has the capacity to steer its borrowers to plaintiff [Agency]. Similar to the real estate brokers in *Lawyers Title, supra,* who receive dividends from referring their insurance business, D&N [LSB] would benefit from referring its customers to plaintiff [Agency]. [Declaratory ruling at 6.]

The Court of Appeals majority held that the commissioner erred in the application of this section. In his lead opinion, Judge SAWYER held that § 1207(3) was limited to a quid pro quo relationship where dividends are distributed in direct proportion to the amount of business referred. *Ludington Service, supra* at 259-260, citing *Lawyers Title Ins Corp v Chicago Title Ins Co,* 161 Mich App 183, 193-194; 409 NW2d 774 (1987). Judge SAWYER went so far as to hold that *THM* was wrongly decided, concluding that § 1207(3) "is not violated where an agency pays a dividend to a shareholder based upon the profits earned by the agency and the shareholder engages in promotion of the insurance agency." *Id.* at 261.

On the other hand, Judge SHEPHERD's concurrence advocated a more moderate approach. He rejected overruling *THM,* and instead rested his decision to reverse on the lack of competent, material, and substantial evidence.[17] In his opinion, the bank's business plan adequately addressed the concerns raised in *THM. Id.* at 268.

We agree with Judge SHEPHERD that the bank's business plan satisfied the concerns raised in

---

[17] Judge SHEPHERD was a member of the *THM* panel and concurred in the result. In the instant case, Judge SHEPHERD explained his concurrence in *THM:*

> I concurred in that opinion because I believed that competent, material, and substantial evidence supported the commissioner's conclusion that the business plan would violate MCL 500.2077(2); MSA 24.12077(2), which precludes a mortgage lender from using information relating to a customer's insurance needs to its advantage or to the detriment of the borrower. I am satisfied that the business plan submitted by plaintiff in this case sufficiently addresses the concerns raised in *THM.* [*Id.* at 268.]

*THM.* Additionally, we agree that the record is devoid of any other competent, material, and substantial evidence necessary to support a violation of § 1207(3).[18] Finally, we are persuaded that the instant case is distinguishable from *Lawyers Title* and *THM.*

In *Lawyers Title,* the Court of Appeals considered a scheme whereby real estate brokers incorporated various title companies in which they were shareholders. The brokers then referred their clients exclusively to these title companies. The brokers/shareholders received dividends based upon the title companies' profits. In some instances, the dividends were proportionate to the amount of referral business expected to be generated by each broker. The Court of Appeals held that this constituted direct remuneration in violation of § 1207(3). *Id.* at 193-194.

In *THM,* the Court of Appeals reached a similar conclusion. The plaintiff was a wholly owned subsidiary of a bank that wanted to set up an insurance agency to handle insurance needs incident to the bank's mortgage operations. The Court held that *Lawyers Title* was not limited to direct kickbacks, but held that the "more business [the subsidiary] has, the more profit [the bank] would make regardless of whether any dividends are ever paid." *THM, supra* at 785.

In the instant case, we are satisfied that the business plan avoids the direct kickback problem addressed in *Lawyers Title.* Similarly, we are satis-

[18] In reaching this conclusion, however, we do not create a safe harbor for arrangements that somehow indirectly, as opposed to directly, reward a holding company for business referred to its subsidiary. We simply hold that there are not sufficient facts in this record to support a violation of § 1207(3).

fied that the business plan avoids the kickback problem addressed in *THM.* In *THM,* it was apparent that virtually all of the subsidiary's business would come directly from the bank's referrals pursuant to its lending activities. In the case at hand, however, the commissioner has yet to determine how much business will ensue directly or indirectly from bank referrals and accordingly constitute dividends inuring to the bank.[19] Nor has the commissioner pointed to any other evidence of remuneration between plaintiff and the bank. Absent such evidence, we cannot say that a "kickback" scheme as contemplated by § 1207(3) was in place.

Furthermore, because the bank seeks to acquire an existing insurance agency, at least some portion of the business will already be in existence, i.e., business unconnected to the bank's lending activities. Accordingly, we conclude that the bank has properly shielded its lending activities from its subsidiary's insurance activities.

### B

Next, the commissioner ruled that the business plan would violate § 2077(2), which provides:

> If an instrument requires that a purchaser,

[19] Additionally, the commissioner admits allowing financial institutions to own insurance companies in situations where coercion and kickbacks are not a problem, e.g., where the bank and the insurance company are located a long distance from one another. In those cases, the profits surely inured to the bank via dividends, but the distance prevented the banking officials from coercing loan applicants to secure insurance via its subsidiary. Therefore, to proscribe a bank from operating an insurance agency on the basis of shareholder dividends is not enough. In the instant case, the record lacks the necessary competent, material, and substantial evidence to ban this business plan at this time.

mortgagor or borrower furnish insurance of any kind on real property being conveyed or which is collateral security to a loan, the vendor, mortgagee or lender shall refrain from using or disclosing any such information to his own advantage or to the detriment of the purchaser, mortgagor, borrower, insurance company or agency complying with such requirement.[20]

The commissioner essentially held that the bank's informational mailings would violate § 2077(2) because it would be received by some customers who are required to obtain insurance as a condition of a mortgage. In short, the commissioner reasoned that the bank would use mortgage information improperly to its own advantage, and for the advantage of plaintiff.[21]

We disagree and hold that the record fails to demonstrate the necessary competent, material, and substantial evidence supporting a violation of

[20] The statute uses the terms "purchaser, mortgagor or borrower," as well as "vendor, mortgagee or lender." While we use these terms interchangeably for purposes of this opinion, our holding is applicable to all of these terms even when only one is mentioned.

[21] The commissioner specifically held that the bank's business plan would violate § 2077(2) because:

5. According to the Plan, [the bank] will make informational mailings to persons who secure mortgages from [the bank]. [The bank] will obtain the names and addresses of these persons through the mortgage process. The [plaintiff] will sell insurance that is required in connection with the mortgages. The informational mailings will promote the sale of this required insurance by the [plaintiff]. If the [plaintiff] is profitable, those profits will inure, directly or indirectly, to the benefit of [the bank].

6. This arrangement will violate Section 2077(2) since, with respect to required insurance on real property which is collateral security to a loan, [the bank] will use information, including names and addresses, to its own advantage. [Declaratory ruling at 13.]

§ 2077(2). We are persuaded that the bank's business plan adequately addressed the concerns raised in *THM.*

In *THM,* the Court found that the commissioner was concerned with direct targeting of mortgage customers according to expiration dates of their customers' insurance policies. The Court stated:

> The commissioner found that insurance agents accordingly want access to information about expiration dates and that D&N could supply that specific information. The commissioner also cited [the insurance agency's] proposed marketing strategy for the solicitation of D&N customers which relied heavily upon exploitation of information about expiration dates of policies held by D&N customers. The marketing strategy included direct mail solicitation, telephone solicitation, mailing pieces in D&N outgoing mail and establishing an expiration-date system. [*Id.* at 778.]

Thus, in *THM,* there was substantial evidence supporting the commissioner's decision.

However, in the instant case, the commissioner lacked the necessary direct evidence to find that there would be an improper use of information. As stated in *THM,* § "2077(2) is clear in that a lender is not to benefit from its knowledge that a borrower must have insurance on the real property which is collateral for the loan." *Id.* at 779. We agree that the plain meaning[22] of § 2077(2) only proscribes a lender from using insurance requirement information to its own advantage or to the

_____

[22] This Court has consistently held that when the statutory wording is unambiguous, it need only be applied. *Dussia v Monroe Co Employees Retirement System,* 386 Mich 244, 249; 191 NW2d 307 (1971); *Franks v White Pine Copper Div,* 422 Mich 636, 650; 375 NW2d 715 (1985).

mortgagor's detriment.[23] Accordingly, we conclude that the bank's business plan clearly addressed § 2077(2) by proscribing the use of this information to the detriment of mortgagors and for the benefit either of the bank or plaintiff.[24] A generalized and untargeted informational mailing to all customers[25] does not exploit the bank's knowledge that a specific borrower must have insurance as a condition of a loan. Absent direct targeting via mailings, the business plan cannot be said to violate § 2077(2).

C

Additionally, the commissioner relied on MCL 500.1207(5); MSA 24.11207(5) to support his theory that operations in accordance with this proposed business scheme would result in threats and intimidation of bank customers to purchase insurance through plaintiff.[26] Section 1207(5) states:

[23] In reaching this holding, this Court recognizes that great deference should be afforded an interpretation of a statute by the agency charged with its administration.

"It is a familiar rule of statutory construction that great weight is properly to be given to the construction consistently given to a statute by the executive department charged with its administration. . . . And such construction is not to be overturned unless clearly wrong, or unless a different construction is plainly required." [*Roosevelt Oil Co v Secretary of State,* 339 Mich 679, 694; 64 NW2d 582 (1954), quoting *United States v Jackson,* 280 US 183, 193; 50 S Ct 143; 74 L Ed 361 (1930).]

However, the plain meaning of § 2077(2) precludes the commissioner's interpretation and findings.

[24] The business plan specifically states that "[t]he Savings Bank will not use or disclose any information obtained from any required policy of insurance to [plaintiff]."

[25] See n 2.

[26] In rendering his decision, the commissioner specifically held the following:

> A person may not sell or attempt to sell insurance by means of intimidation or threats, whether express or implied. Except as provided in section 2077(4) a person may not induce the purchase of insurance through a particular agent or from a particular insurer by means of a promise to sell goods, to lend money, to provide services, or by a threat to refuse to sell goods, to refuse to lend money, or to refuse to provide services.

The Court of Appeals majority was not in accord in its treatment of § 1207(5). Judge SAWYER held that the business plan does not threaten to refuse to lend money. Accordingly, he reasoned that the commissioner lacked substantial evidence to support his findings. He contended that § 1207(5) focuses on the actions of the insurance agents rather than the subjective beliefs of customers. Applying this analysis, he held that the business plan, as *presently formulated,* failed to demonstrate any intended use of threats or intimidation. *Id.* at 262-265.

Judge SHEPHERD agreed that the commissioner lacked specific evidence to support his findings, but argued that reasonable subjective beliefs of customers regarding specific acts either of the plain-

7. According to the Plan, [the bank] will make informational mailings to its borrowers and the general public with respect to the availability of insurance services from the [plaintiff] and with respect to the affiliation between [the bank] and the [plaintiff]. These mailings will promote a perception among borrowers that loans from [the bank] are tied to insurance sales. If the mailings are done with frequency to [bank] customers, some customers will receive promotional literature at the same time they are making applications for new loans.

8. Under this arrangement, it is probable that the sale of insurance by the [plaintiff], as promoted by [the bank], will . . . give rise to implied threats to refuse to lend money in violation of Section 1207(5). [Declaratory ruling at 13.]

tiff or the bank could be considered when evaluating whether threats or intimidation occurred. However, he held that the record failed to demonstrate substantial evidence with regard to specific acts, thereby failing to provide the necessary justification for the commissioner's ruling. *Id.* at 268.

In reviewing § 1207(5), we note that the question of threats or intimidation centers only on the commissioner's fear that the bank will promise or threaten to refuse to lend money. On this issue, we agree with Judge SHEPHERD that the record lacks the necessary competent, material, and substantial evidence to support a violation of § 1207(5). We need not go so far as the Court of Appeals, however, in deciding whether § 1207(5) focuses only upon the insurance agent's actions or also considers a customer's reasonable subjective beliefs. We simply note that the commissioner is afforded great deference in this area. Nonetheless, under either view, the commissioner failed to point to any specific acts[27] on the part of the bank or plaintiff.

Furthermore, we disagree with the commissioner's contention that the bank's proposed safeguards "promise more than they deliver." He contends that the safeguards only prevent abuses by loan personnel taking mortgage applications, but not other types of loans. The commissioner also argues that nothing in the plan prohibits bank employees from soliciting business for the plaintiff before a formal loan application is submitted. Declaratory ruling at 12.

Although the proposed business plan may not be

---

[27] We note that the commissioner did not consider any subjective customer beliefs or complaints because the business venture had not yet been established.

the most precisely drafted document, we conclude that it clearly does implement safeguards for all loan applications, not just mortgage applications. Under its "Communications" section in its business plan, the bank states:

> 2. The Savings Bank may advise the general public and its savings and mortgage customers that insurance services are available from the Service Corporation Agency and advise how to obtain more information about the insurance service, except that:
>
> a. such information shall not be occasioned by submission of any loan application, nor any inquiry about the availability, terms, and conditions of any loan. [Business Plan at 5.]

Clearly, therefore, the plan proscribes conduct with regard to all loan activities by addressing both formal submissions of loan applications as well as inquiries.

Similarly, we are not persuaded by the commissioner's fear that "even assuming the actual practice is in steadfast conformity with the business plan, an employee of [plaintiff] could approach any loan customer right in the Bank at any point in a loan transaction and personally attempt to sell required insurance."

This abuse may occur in the future, but at this point the commissioner's concern is mere speculation, unsupported by substantial evidence. While the language of the business plan specifically addresses only what the bank would or would not do, the business plan and the announced intent of both the bank and plaintiff indicate that plaintiff would not and probably could not engage in such activities. With regard to the actual transfer of

lending information, the business plan prohibits the bank from transferring it to plaintiff. Therefore, the likelihood of the plaintiff obtaining this information is minimal.

However, were the plaintiff to conduct surveillance of loan applicants and thereafter solicit them to buy their insurance by means of a promise or threat of refusal to lend money via the bank, the commissioner would have adequate grounds to revoke the license under § 1207(5).[28] Until this occurs, the commissioner lacks sufficient facts to support a violation.

Finally, we disagree with the commissioner's conclusion that no adequate regulatory controls are possible to prevent the inherent pressure and intimidation that customers would endure where a subsidiary of a financial institution sells insurance to the financial institution's borrowers. Declaratory ruling at 9-10, citing *THM, supra* at 780.[29] We

[28] We reject the commissioner's argument that "there is no way to adequately monitor the Bank in order to be sure its actual practices conform to its assurances . . . ." We find that this problem is no different than monitoring other insurance agencies for possible violations of the Insurance Code. Upon receiving complaints or by some other investigative technique, the commissioner is empowered to order a summary suspension of a license in efforts to protect the public interest under MCL 500.1242(4); MSA 24.11242(4) or can seek subpoenas to compel witness testimony and production of documents under MCL 500.1242(5); MSA 24.11242(5). These tools, along with standard investigative efforts, provide a sufficient basis to monitor Insurance Code abuses.

[29] The commissioner relied on hearing testimony in the *THM* case to support his belief that disclosures or warnings would not alleviate the inherent pressure in the minds of borrowers. He cited Emmett Vaughn's testimony in *THM:*

"I think with respect to consumers it creates conditions in which their range of choices could be narrowed either explicitly or in their own minds. It subordinates.

\* \* \*

find that regulatory controls are possible and that the record supports the bank's intention to implement adequate safeguards in order to address § 1207(5). These intentions are illustrated by not requiring borrowers to purchase insurance from plaintiff, shielding all lending activities from insurance activities, conspicuously marking the separate areas and not displaying any insurance materials in loan application areas, not initiating discussions concerning insurance during the loan application process, and providing written disclosures if inquiries are made. Therefore, at this point, the commissioner lacks specific evidence supporting his claim that the plan permits inducement to purchase insurance by means of a promise or threat of refusal to lend money.

III

Finally, while this Court affords deference to an agency's findings of fact, we can always review an agency's legal findings. Both the Michigan Constitution[30] and the applicable statute[31] permit this Court to set aside the commissioner's findings if they are "[i]n violation of the constitution or a statute," or "[a]ffected by other substantial and material error of law." *Southfield Police, supra* at

"There are dozens of ways that we have tried to sanitize the transaction. None of them seem to have worked.

"I think that the voluntary tie-in, of course, is structural. It is inherent in the combination of the sale of any product and the extension of credit. People think that they will enhance the likelihood that they are going to get the credit by buying this other product." [Declaratory ruling at 10-11.]

[30] See n 13.
[31] See n 14.

175, citing MCL 24.306(1)(a), (f); MSA 3.560(206)(1)(a), (f).

Our reading of § 1242(3) persuades us that the commissioner improperly based his decision[32] on this section because it only empowers the commissioner to review the *granting and renewing* of a license. It does not apply to the acquisition of an *existing* insurance agency. Section 1242(3) provides:

> After notice and opportunity for a hearing, the commissioner may refuse to grant or renew a license to act as an agent, solicitor, adjuster or insurance counselor if he determines by a preponderance of the evidence, that it is probable that the business or primary occupation of the applicant will give rise to coercion, indirect rebating of commissions or other practices in the sale of insurance which are prohibited by law.

While the commissioner acknowledged that plaintiff was only seeking to acquire a licensed insurance agency and limited his ruling to this issue,[33] he failed to indicate how and why § 1242(3) applies to a proposal to purchase a *licensed* insurance agency.[34] Therefore, we find that § 1242(3) is

[32] The commissioner analyzed § 1242(3) in conjunction with § 1207(5). He joined his analysis of the terms "coercion," as used in § 1242(3), and "threats or intimidation," as used in § 1207(5), to find that the business plan would result in improper pressure on consumers to purchase insurance from plaintiff.

Similarly, the Court of Appeals majority reviewed §§ 1242(3) and 1207(5) together in regard to the alleged improper tactics. However, the Court of Appeals did not consider whether § 1242(3) was properly applied as a matter of law.

[33] See n 8. Because the commissioner refused to consider future compliance proceedings, § 1242(3) necessarily cannot be considered. The renewal of the license clearly would be a future compliance proceeding.

[34] We acknowledge that this argument was not raised in the trial

not implicated by this declaratory relief action.

Moreover, although this Court affords an agency some statutory deference,[35] the agency's interpretation is not binding on this Court, and *"cannot be used to overcome the statute's plain meaning . . . ." Grand Rapids Ed Ass'n v Grand Rapids Bd of Ed,* 170 Mich App 644, 651; 428 NW2d 731 (1988) (emphasis added). See also *Buttleman v State Employees' Retirement System,* 178 Mich App 688, 690; 444 NW2d 538 (1989), and *Allstate Ins Co v Dep't of Ins,* 195 Mich App 538, 545; 491 NW2d 616 (1992).

We conclude that the plain meaning of § 1242(3) clearly limits the commissioner's powers to the granting or renewing[36] of a license. It does not contemplate the acquisition by means of a sale of

court, but was first raised on appeal. Nonetheless, this does not necessarily preclude this Court's direct consideration of the argument.

> The general rule that a question may not be raised for the first time on appeal to this court is not inflexible. When consideration of a claim sought to be raised is necessary to a proper determination of a case, such rule will not be applied. [*Dation v Ford Motor Co,* 314 Mich 152, 160-161; 22 NW2d 252 (1946).]

We find that consideration of this issue is necessary for a clear understanding of the applicable Insurance Code provision in acquisitions of existing insurance agencies.

[35] We recognize that when reviewing whether an agency's legal ruling violates a statute, this Court accords deference to the "'construction placed upon statutory provisions by any particular department of government for a *long period of time* . . . .'" *Southfield Police, supra* at 177 (emphasis added, citations omitted). In the present case, however, the commissioner does not allege that there has been a longstanding policy of applying § 1242(3) to acquisitions of licensed insurance agencies.

[36] Section 1214(7) states that a "license shall continue in effect until suspended or revoked by the commissioner or voluntarily surrendered by the licensee." Reading this section in conjunction with the § 1242 provisions, we find that "renewing" refers to requests for reinstatement because of either a suspension, revocation, or voluntary surren-

an existing license or the revocation of an existing license.[37] The commissioner therefore erred as a matter of law in basing part of his declaratory ruling on § 1242(3).[38]

---

dering of a license. In the instant case, none of these events has occurred.

[37] Although the commissioner refused to rule on future revocation proceedings, we note that he will be able to use subsections (2) and (4) of § 1242 immediately after acquisition if sufficient justifications exist to suspend or revoke the license.

Section 1242(2) provides:

The commissioner, after notice and opportunity for a hearing, may suspend or revoke the license of an agent, solicitor, insurance counselor or adjuster who fails to maintain the standards required for initial licensing or who violates any provision of this act.

Section 1242(4) provides:

Without prior hearing, the commissioner may order summary suspension of a license if he finds that protection of the public requires emergency action and incorporates this finding in his order. The suspension shall be effective on the date specified in the order or upon service of a certified copy of the order on the license, whichever is later. If requested, the commissioner shall conduct a hearing on the suspension within a reasonable time but not later than 20 days after the effective date of the summary suspension unless the person whose license is suspended requests a later date. At the hearing, the commissioner shall determine if the suspension should be continued or if the suspension should be withdrawn, and, if proper notice is given, may determine if the license should be revoked. The commissioner shall announce his decision within 30 days after conclusion of the hearing. The suspension shall continue until the decision is announced.

[38] The Court of Appeals in *Lawyers Title, supra* at 202, applied virtually the same analysis and conclusion. It stated:

[T]he unambiguous language of § 124[2](3) applies to the commissioner's decision to grant or renew a license; in contrast, § 124[2](2) applies to the commissioner's decision to suspend or revoke a license. Where statutory language is clear, judicial construction is neither required nor permitted. *Attard v*

IV

We conclude that the commissioner lacked the necessary competent, material, and substantial evidence to support his findings of violations of §§ 1207(3), 2077(2), and 1207(5). Additionally, we find that the commissioner erred as a matter of law in applying § 1242(3) to the instant case. Section 1242(3) is limited to the granting or renewing of a license, as opposed to the acquisition of a licensed insurance agency. Accordingly, we affirm the decision of the Court of Appeals.

CAVANAGH, C.J., and LEVIN, BRICKLEY, BOYLE, GRIFFIN, and MALLETT, JJ., concurred with RILEY, J.

*Adamczyk,* 141 Mich App 246, 250; 367 NW2d 75 (1985). This case involved the commissioner's decision to suspend or revoke respondents' licenses; it did not involve the decision to grant or renew respondents' licenses. Consequently, § 1242(3) does not apply to this case.