NEDERHOOD v CADILLAC MALLEABLE IRON COMPANY

ZIMMERMAN v CADILLAC MALLEABLE IRON COMPANY

Docket Nos. 94110, 94299. Argued October 5, 1993 (Calendar Nos. 3-
4). Decided May 31, 1994. Rehearing denied in *Nederhood, post,*
1237.

Roger Nederhood and James Zimmerman separately sought
worker's compensation benefits for disability that allegedly
arose out of and in the course of their employment with
Cadillac Malleable Iron Company. A hearing referee found the
plaintiffs to have been partially disabled at the commencement
of a strike between Malleable and their union, but denied them
benefits during the period of their participation in the strike.
The referee found, however, that wage loss benefits recom-
menced when an offer by the union to return to work termi-
nated any unreasonable refusal by the plaintiffs to perform
favored work. The referee additionally found that Zimmerman
became totally disabled on February 4, 1982, as a result of a
supervening heart condition unrelated to his favored work. In
separate proceedings, the Worker's Compensation Appeal
Board affirmed the referee's findings with respect to dates of
injury and the cessation of benefits during the strike, but
reversed with regard to the restoration of wage loss benefits
after the union's offer, finding no showing that plaintiffs per-
sonally had offered to return to work. The Court of Appeals,
HOOD, P.J., and CONNOR and RICHARD KAUFMAN, JJ., affirmed
in an unpublished opinion per curiam. In *Zimmerman,* it held
that the WCAB had not applied erroneous legal reasoning in
determining that the plaintiff's refusal to perform favored
work while on strike, and not the actions of the union in
striking, provided a basis for denying benefits, and that such
forfeiture continued for the duration of the plaintiff's unwill-
ingness to return to work. It additionally found that Zimmer-
man's supervening heart attack did not render him eligible for
benefits, because he failed to communicate his willingness to
return to work before the heart attack (Docket No. 134288). In
*Nederhood,* the Court held that the WCAB had correctly applied
the law in determining that the plaintiff's participation in the
strike precluded collection of work loss benefits during the
pendency of the strike and that he had not personally offered

to return to favored work (Docket No. 134290). The plaintiffs appeal.

In separate opinions, the Supreme Court *held:*

A voluntary cessation of favored work per se does not result in a permanent forfeiture of wage loss benefits. In *Zimmerman,* the occurrence of the plaintiff's heart attack while on strike does not preclude the recovery of wage loss benefits.

Generally, a refusal of suitable work suspends benefits for the duration of the refusal. However, a permanent forfeiture of benefits is not in accord with a liberal construction of the Worker's Disability Compensation Act.

*Nederhood* reversed and remanded for further proceedings.

*Zimmerman* reversed.

Justice BRICKLEY additionally stated that a voluntary cessation of favored work by a striking employee should result in a suspension of wage loss benefits. Neither a conditional offer to return by a worker's union nor the hiring of permanent replacement workers by the employer should operate to automatically restore benefits to the striking employee. However, benefits should be restored once the employee expresses a good-faith willingness to return to favored work, provided such willingness is communicated to the employer within a reasonable period following the cessation of favored work. The resumption of such an employee's right to benefits upon the occasion of a supervening heart attack that renders the employee totally disabled should depend on the certainty and extent of the injury, the length of the refusal to perform favored work before the injury, and the lack of a causal nexus between the refusal of favored work and the resulting heart attack.

Justice BOYLE, joined by Chief Justice CAVANAGH and Justice MALLETT, concurring in part and dissenting in part, additionally stated that the hiring of permanent replacement workers, in fact and in law, may work to withdraw an employer's offer of favored work. An employee's right to benefits is suspended only as long as there is a voluntary withholding of services. If the employer has revoked the offer of favored work with the hiring of replacement workers, then the refusal to work is no longer due to the strike.

The issue of the adoption of a reasonable time limitation on an employee's ability to reestablish the right to favored work is not properly before the Court and its disposition is unwarranted. However, only because three members of the Court propose the adoption of such a limitation is it necessary to oppose this adoption. The reasonable time limitation would present employers with a windfall by relieving them of the

obligation to pay owed benefits or offer favored work without policy justification.

Justice RILEY, joined by Justice GRIFFIN, concurring in part and dissenting in part, additionally stated that a striking favored worker fully disabled by a supervening event is not entitled to a reinstatement of benefits without showing an intention to have returned to work but for the supervening event.

A favored worker who refuses to perform favored work because of participation in a strike forfeits the right to compensation. The worker only becomes eligible to have benefits restored when a good-faith willingness to resume favored work is tendered. Reasonableness must apply to both parties. A favored worker's unreasonable delay in accepting an offer of favored work relieves the employer of liability. In *Nederhood*, the plaintiff failed to present a prima facie case and appropriately was denied relief.

A supervening event causing cessation of an employee's favored work will not terminate the right to benefits as long as the event is not under the employee's control. While such an event does not preclude payment of compensation, the favored work doctrine does not require compensation to be automatically revived upon its happening. A claimant must show that favored work already was being performed and that a supervening independent event precluded its continuance. In *Zimmerman*, the plaintiff was not entitled to benefits. He was not performing favored work when he suffered the heart attack, but was voluntarily participating in a strike, and he failed to present evidence that he would have returned to work despite the strike and the decertification of the union. His disability is irrelevant to his ability to receive benefits because he would have been ineligible for such benefits if he had not had the heart attack.

Justice LEVIN, writing separately, joined in reversal in *Zimmerman*, and would remand with the direction that benefits should be awarded to Nederhood, but joined in remand to provide a fourth vote for a disposition that may result in the award of compensation.

MCL 418.301(5)(a); MSA 17.237(301)(5)(a), effective January 1, 1982, providing that a disabled employee who refuses a bona fide offer of reasonable employment from a previous employer, another employer, or through the Employment Security Commission without good and reasonable cause is no longer entitled to any wage loss benefits during the period of such refusal, is

inconsistent with the view that such a refusal results in permanent forfeiture of worker's compensation benefits.

That statutory provision is also inconsistent with the view that because it would be unreasonable to expect the employer to keep such positions open beyond the point that it announced the jobs would be filled by permanent replacements, Nederhood may not recover benefits. While the needs of the employer may justify the employer in not keeping an offer open beyond a reasonable time, the need of the employee to participate in a strike may justify a refusal to work during a strike. The disabled worker is nevertheless disabled and can properly be denied benefits only during the period of a refusal, without good and reasonable cause, of a bona fide offer of reasonable employment from a previous employer, another employer, or through the MESC. The period of such a refusal is a question of fact, and the burden of showing refusal of work should be borne by the employer because the offer of favored work is in mitigation of damages.

*Bott & Spencer, P.C.* (by *Timothy J. Bott*), for the plaintiff.

*Russell & Carowitz* (by *Fanny L. Vail*) for the defendant.

BRICKLEY, J. We granted leave in these cases to determine whether the Worker's Compensation Appeal Board and the Court of Appeals erred in concluding that the plaintiffs-appellants were disqualified from receiving worker's compensation benefits because they left favored work to participate in a strike that resulted in the use of permanent replacements. In deciding this issue, we must determine whether the hiring of permanent replacement workers obligates an employer to renew its offer of favored work to its injured employees, or whether the employee must take action to reinstate benefits. In the case of plaintiff-appellant James Zimmerman, who became fully disabled after the strike had begun, we must determine whether such total disability operates to revive his right to benefits.

We conclude that where a striking favored worker has voluntarily ceased performance of favored work, benefits should be restored once the favored worker expresses a good-faith willingness to return to favored work, provided this willingness is communicated to the employer within a reasonable time after the cessation of favored work. Such benefits should not automatically be restored upon the hiring of permanent replacement workers by the employer. Additionally, we would hold that plaintiff Zimmerman's supervening heart attack, which rendered him totally disabled, revived his right to benefits.

I

A

This dispute arose out of a labor strike between defendant-appellee Cadillac Malleable Iron Company and Local 784 of the UAW, of which plaintiffs-appellants, James Zimmerman and Roger Nederhood, were members. On September 30, 1981, the collective bargaining agreement between Cadillac and the union expired, and the union struck on October 1, 1981, when it became apparent that a new agreement was not forthcoming. At this time, approximately thirty-five proposals for a new contract were unresolved. Cadillac was demanding twenty-four additional language changes in the contract and the union was demanding a $2 per month increase in the employer's pension contribution for current retirees.

On October 7, 1981, Cadillac modified its September 30 proposal and submitted it to the union. These modifications included an extension of seniority retention during layoff to thirty-six

months.[1] This offer was rejected by the union and was withdrawn by Cadillac by October 22, 1981.

On January 12, 1982, Cadillac officially informed the union that it would be hiring permanent replacement workers. At a January 18, 1982, bargaining session, the union attempted to accept the October 7, 1981, proposal, and offered to accept a dollar an hour cut in wages. Cadillac informed the union representative that the October 7 proposal had been withdrawn, and insisted on limiting wages to $6 per hour with no cost-of-living adjustment, and on limiting the number of plant classifications. The union representative terminated this meeting.

As of March, 1983, forty-one or forty-two replacement workers had been hired. At the time of the strike, approximately eighty workers had been employed by Cadillac. The record is silent with regard to whether plaintiffs' favored work positions had been given to permanent replacements.

B

A hearing referee found both Zimmerman and Nederhood to have been partially disabled at the commencement of the strike, but determined that plaintiffs were not entitled to wage loss benefits for the period between October 1, 1981, and January 18, 1982, because of their participation in a strike.[2] The referee found, however, that wage loss benefits recommenced on January 18, 1982, determining that the union's "offer to return" to

[1] The September 30, 1981, proposal contained a provision allowing seniority retention during layoff for only twenty-four months. The provision in the expired collective bargaining agreement had provided for retention of seniority during layoff for a period of time equal to the length of employment with the company.

[2] Although these cases were not consolidated below, both cases were heard by the same referee and were reviewed by the same panel of the Court of Appeals.

work on this date terminated any unreasonable refusal by plaintiffs to perform favored work.

Additionally, the hearing referee found that on February 4, 1982, plaintiff Zimmerman became totally disabled as a result of his supervening, non-work-related heart condition.

The WCAB affirmed the hearing referee's findings with respect to injury dates and the cessation of benefits during the strike, but reversed the referee's determination that plaintiffs were entitled to restoration of wage loss benefits as of January 18, 1982, finding instead that there was no showing that plaintiffs themselves had offered to return to work at any time before the WCAB hearing.[3]

Plaintiffs' applications for leave to appeal to the Court of Appeals were denied for lack of merit, and we remanded for consideration as on leave granted. The Court of Appeals affirmed the decisions of the WCAB. In *Zimmerman,* it held that the WCAB had not applied erroneous legal reasoning in determining that plaintiff's *individual* refusal to perform favored work while his union was on strike, and *not* the actions of the union in striking, provided a basis for denying benefits, and that such forfeiture continued for the duration of plaintiff's unwillingness to return to work. In *Nederhood,* it held that the WCAB had correctly applied the law in determining that Nederhood's participation in the strike precluded him from collecting wage loss benefits during the pendency of the strike. The Court of Appeals also found that the record adequately supported the board's holding that plaintiffs had not personally offered to return to favored work, and that the union's January 18, 1982, "offer" was merely another proposal in a series of negotiations.

[3] 1989 WCABO 239; 1989 WCABO 471.

Additionally, in *Zimmerman,* it found that plaintiff's supervening heart attack did not render him eligible for benefits because he had failed to communicate his willingness to return to work before his supervening heart attack, thus failing to meet his burden of establishing his entitlement to benefits.

On March 16, 1993, we granted leave to appeal, ordering that *Zimmerman* and *Nederhood* be submitted and argued together. 442 Mich 867.

## II

As a preliminary matter, we note that the parties do not dispute that the plaintiffs were performing favored work at the time of the strike.[4]

Additionally, the parties do not contest that before the union's offer to return to work on December 4, 1981, under a contract incorporating prestrike terms, plaintiffs were disqualified from receiving benefits on the basis of their voluntary cessation of favored work stemming from their participation in a strike.[5] We must now decide the duration of this disqualification.

---

[4] Favored work has been defined as

> work offered by the employer to a disabled worker that was limited or restricted so as to be within the worker's capacity to perform. [Welch, *Worker's Compensation in Michigan: Law & Practice* (rev ed), § 10.11, p 10-13.]

Cadillac accommodated Zimmerman's limitations by providing him work in the core room, where the maximum weight to be lifted was five pounds. Nederhood's limitations were accommodated by assigning him unskilled common labor to perform.

[5] See, e.g., *Bower v Whitehall Leather Co,* 412 Mich 172, 188; 312 NW2d 640 (1981) ("interruptions of work caused by voluntary actions of the employee, such as abandonment of work to participate in a strike . . . result[ ] in a forfeiture of benefits"); *Pigue v General Motors Corp,* 317 Mich 311; 26 NW2d 900 (1947) (an employee forfeits the right to benefits for the period in which he refused favored work that he could perform).

Although *Bower* focused on the actions of the employee, we see no

The general rule is that a refusal of suitable work suspends benefits for the duration of the refusal.[6] Although this Court has never expressly decided the question,[7] in *Bower v Whitehall Leather Co,* 412 Mich 172; 312 NW2d 640 (1981), we utilized a case that supports this rule, and our decision in *Pigue v General Motors Corp,* 317 Mich 311; 26 NW2d 900 (1947), seems also to imply a suspension of benefits instead of a permanent forfeiture.

A

The *Bower* Court's citation, with apparent approval, of *PPG Industries, Inc v Aites,* 7 Pa Commw Ct 588; 300 A2d 902 (1973), supports the conclusion that *Bower* envisioned only a temporary loss of benefits. In *PPG Industries, Inc,* the

reason to distinguish between the actions of the union and those of the employees because plaintiffs' unwillingness to work is evidenced irrespective of whether we focus our analysis on the actions of the employee or those of the union.

[6] See 1C Larson, Workmen's Compensation, § 57.66(c), pp 10-492.75 to 10-492.76.

[7] Note that in the area of discharges based on moral turpitude, this Court has spoken, seemingly concluding that a permanent forfeiture results. In *Todd v Hudson Motor Car Co,* 328 Mich 283; 43 NW2d 854 (1950), the partially disabled employee had been terminated for engaging in criminal activity while on favored work. The Court reversed an award of benefits, holding that where an employee

engages in criminal gambling activities while at work and is discharged for that cause, he will not be entitled to compensation for the resultant loss of earnings. His favored employment has ceased through his own volition and turpitude and not by reason of his accidental injury. . . .

It was not through physical inability to perform the work, arbitrary caprice of the employer, or some ordinary cause for dismissal that this employment was terminated. [*Id.* at 289.]

See also *Garrett v Chrysler Corp,* 337 Mich 192; 59 NW2d 259 (1953), where a permanent forfeiture resulted when the plaintiff was discharged for coming to work under the influence of alcohol. However, in neither case did the Court expressly state that the forfeiture was permanent; it was only implicit in the holding.

employee left his favored work to become a minister. Once it became evident that he was unable to earn a living as a minister, he attempted to find other light work. The court held that he had not permanently forfeited his benefits by leaving favored work. The combination of the claimant's attempt to find employment other than as a minister and the unavailability of his old favored position triggered his eligibility for benefits.

B

The *Pigue* Court did not expressly address this issue because the claimant had returned to favored work upon settlement of the strike. In framing the issue, however, the Court stated that the pivotal question was whether the plaintiff was entitled to compensation *"during the period of a strike . . . ." Id.* at 315. While the weight to be accorded this is minimal, it lends credence to the view that suspension is the sanction implicit in *Pigue.* Noteworthy, also, is that the *Pigue* Court neither stated nor intimated that a permanent forfeiture results.

C

Larson, in his treatise on worker's compensation, opines that a temporary forfeiture of benefits is the preferred sanction. Although discussed within the context of employee misconduct, the reasons underlying his conclusions apply with equal force to the striking employee. Larson states that an injured employee discharged for misconduct should not suffer a permanent loss of benefits. He draws an analogy to the unemployment context, in which misconduct-based discharges and voluntary quitting are handled by imposing a

penalty of a limited number of weeks. Likewise, he concludes that in the worker's compensation arena, the penalty for a voluntary cessation of favored work should also be limited to a loss of benefits for a period of weeks.[8]

D

The Minnesota Supreme Court has grappled with this issue and determined that only a temporary forfeiture of benefits should result. *Marsolek v George A Hormel Co,* 438 NW2d 922, 923 (Minn, 1989). In this case, a partially disabled employee, Marsolek, was terminated for misconduct during a strike against the employer. Marsolek had threatened to damage cars and injure employees attempting to cross the picket line. When the plant was reopened five months after the strike began, Marsolek was not invited to return. Except for a three-month period following the strike, he was unable to find employment, and filed a claim for worker's compensation benefits, including a claim for lost wages. The court held that

> a justifiable discharge for misconduct *suspends* an injured employee's right to wage loss benefits; but the suspension of entitlement to wage loss benefits will be lifted once it has become demonstrable that the employee's work-related disability is the cause of the employee's inability to find or hold new employment. Such a determination should be made upon consideration of the totality of the circumstances including the usual work search "requirements." [*Id.* at 924. Emphasis added.]

In reaching this conclusion, the court noted that the purpose of the Worker's Compensation Act

---

[8] 1C Larson, *supra,* § 57.64(a), p 10-492.27. But see, *Todd v Hudson Motor Car Co,* n 7 *supra,* and *Garrett v Chrysler Corp,* n 7 *supra* (seemingly contemplating permanent forfeiture).

was to compensate injured employees for a wage loss attributable to a work injury. On this basis, compensation has been denied where the record established only a discharge for misconduct;[9] but benefits have been awarded where the record evidenced misconduct, yet showed that the employee's injury was the cause of his inability to find other work.[10]

E

The Court of Appeals has, on several occasions, spoken on the issue of permanent forfeiture. In *Hartsell v Richmond Lumber Co,* 154 Mich App 523; 398 NW2d 456 (1986), the employee left his favored work as a night watchman and began working elsewhere. Hartsell was given compensation for total disability during the period between his injury and his employment as a night watchman, and was given compensation for partial disability for the period up until his hearing, but was denied compensation for lost wages during the period following his cessation of favored work. In February, 1978, Richmond Lumber closed its plant, and in May, 1978, Hartsell filed a petition for compensation. The Court of Appeals affirmed an award of benefits from the time of the plant closing, holding that the plant closure was a tacit withdrawal of the offer of favored work, rendering Hartsell eligible for benefits.

The Court of Appeals reached a similar result in *Steward v Westran Corp,* 130 Mich App 68; 343 NW2d 7 (1983). In this case, the plaintiff initially

---

[9] See, e.g., *Rodge v United Van Bus Delivery,* 330 NW2d 715 (Minn, 1983) (compensation was denied where a truck driver lost his license because of a DWI conviction).

[10] See, e.g., *Kurowski v Kittson Memorial Hosp,* 396 NW2d 827 (Minn, 1986) (an employee was determined to be eligible for rehabilitation benefits, despite being fired for fraudulent use of sick leave).

accepted Westran's offer of favored work, but upon completion of his first favored work assignment, he rejected Westran's offer of additional favored work. Later, while his claim for compensation was pending, the plaintiff requested reassignment to favored work. The Court held that the plaintiff forfeited his benefits during the period of his refusal of favored work, but that such forfeiture terminated upon the plaintiff's request for reassignment.

A different result was reached by the Court of Appeals in *Russell v General Motors Corp,* 172 Mich App 627; 432 NW2d 738 (1988). In this case, General Motors offered Russell favored work on April 18, 1980. Russell failed to respond. On April 8, 1981, a hearing referee concluded that benefits could be terminated because of Russell's failure to accept favored work. Following this decision, General Motors fired Russell, and on October 27, 1981, Russell attempted to accept the offer of favored work. When General Motors refused, Russell filed a claim for worker's compensation benefits. The Court held that the offer of favored work need only be kept open for a reasonable time, after which the employee *permanently forfeits* any right to benefits.[11] It should be noted that the permanent forfeiture did not stem from the employee's *initial* rejection of favored work; rather, it was triggered by the employee's refusal to accept favored work within a reasonable time after the offer was made.

---

[11] Pursuant to Administrative Order No. 1984-2, the *Russell* panel certified that its decision conflicted with the Court of Appeals decision in *Hartsell. Russell* rejected the blanket rule laid down in *Hartsell* that the employee's right to benefits is suspended only for the duration of *the employee's unreasonable refusal of favored work. Russell* holds that the employer need only keep open an offer of favored work for a reasonable time. This holding was premised on the idea that the employee's unreasonable refusal triggered the forfeiture and that, after a period of time, it becomes unreasonable to assume that the employee might accept the offer he once rejected.

F

In formulating our decision on this issue, we must also be mindful of the policies underlying the Worker's Disability Compensation Act. MCL 418.101 *et seq.*; MSA 17.237(101) *et seq.* As a preliminary matter, it must be remembered that the act was designed to be remedial and must not be unnecessarily construed so as to favor a denial of benefits. The *Bower* Court opined:

> The Workers' Disability Compensation Act was designed to help relieve the social and economic difficulties faced by injured workers. As remedial legislation, it is liberally construed to grant rather than deny benefits. [*Id.* at 191.]

It would seem that a permanent forfeiture of benefits is not in accord with a liberal construction of the Worker's Disability Compensation Act.

G

Finally, support for the concept of a temporary suspension of benefits can be drawn from an amendment of the worker's compensation legislation that contains the first statutory reference to the favored work doctrine and was implemented while this case was progressing.[12] Despite the inapplicability of this legislation to the case at bar, it cannot be ignored in formulating a policy to be applied in future cases. The statute provides:

> If an employee receives a bona fide offer of reasonable employment from the previous employer, another employer, or through the Michigan employment security commission and the employee refuses that employment without good and

---

[12] MCL 418.301(5)(a); MSA 17.237(301)(5)(a).

reasonable cause, the employee shall be considered
to have voluntarily removed himself or herself
from the work force and is no longer entitled to
any wage loss benefits under this act *during the
period of such refusal.* [MCL 418.301(5)(a); MSA
17.237(301)(5)(a). Emphasis added.]

The only plausible interpretation of this statute is
that benefits will be suspended for the duration of
the employee's unreasonable refusal to accept em-
ployment. If permanent forfeiture were the in-
tended consequence, the phrase, "during the pe-
riod of such refusal," would be rendered meaning-
less.

In view of the above, we would hold that a
voluntary cessation of favored work per se does
not result in a permanent forfeiture of wage loss
benefits. We note that this holding is in accord
with the views espoused by Larson and most of the
cases cited,[13] and represents what we believe to be
the better approach as a matter of policy, given
the worker's compensation legislation in general,
and more specifically, the recently enacted amend-
ments implemented following the commencement
of this case. A temporary suspension of benefits, in
contrast to a permanent forfeiture, comports with
the dual aims of worker's compensation, namely,
mitigation and rehabilitation, without enabling
the employer to enjoy a windfall.

### III

Our conclusion that an unreasonable refusal or
cessation of favored work does not necessarily
cause permanent forfeiture of benefits compels a

---

[13] The decision in *Russell, supra,* is also in accord with this conclu-
sion, if it is read as holding that a permanent forfeiture does not stem
from the initial refusal of favored work, but, instead, follows from the
failure of the employee to accept the favored work within a reason-
able period.

determination of what act or acts operate to reinstate those benefits.

## A

This issue was addressed by the Court of Appeals in *Chilcote v Cadillac Malleable Iron Co,* 198 Mich App 166; 497 NW2d 211 (1993),[14] in which the Court held that a voluntary participant in an ongoing strike must inform his employer of his willingness to return to work *for that employer* before he can be entitled to compensation benefits. The Court stated:

> [P]laintiff, in order to be entitled to compensation benefits while a strike is ongoing and in which he is a voluntary participant, must show that he informed his strikebound employer of his willingness to return to work for that employer. Working for other employers is not evidence that plaintiff is willing to return to work for his strikebound employer. [*Id.* at 171.]

In essence, the Court assumed the existence of an offer of favored work and, in this context, held that the employee had the burden of showing that he had informed his employer of his willingness to return to favored work.

The Court of Appeals also addressed this issue in *Russell v General Motors, supra* at 632, when it held that

> [t]here comes a point after which it is *unreasonable* to think that such employee might someday accept the offer that was originally spurned. It is at that point that a company should be permitted to withdraw its offer with no fear of disadvantage. [Emphasis added.]

---

[14] This case arose out of the same strike as in the case at bar.

We believe that the rules announced in *Chilcote* and *Russell* strike the best balance between the interests of the injured striking employee and the employer whose offer of favored work has been rejected. Fairness, as well as ease of administration, dictates that the party refusing favored work bears the burden of proving a willingness to perform such work, and that such willingness must be expressed within a reasonable period. An employer should not have to continuously bear the burden of initiating a renewal of favored work, nor should the employer be forced to hold favored positions open indefinitely.

We conclude then that an employee who has ceased to perform existing favored work should establish a good-faith willingness to accept or resume favored work that remains available in order to restore eligibility for benefits. Additionally, this willingness should be expressed within a reasonable period in order to be effective.

**B**

Plaintiffs advance two theories in support of their argument that, even under the above-mentioned rule, they are entitled to a resumption of benefits. Initially, plaintiffs argue that they expressed the requisite willingness to return on January 18, 1982, when the union representative attempted to accept Cadillac's October 7, 1981, offer, an offer that had already been withdrawn. Plaintiffs assert that this purported "offer to return" operated to transform them into involuntary strikers.

Because it was the union that "offered to return," we must first determine whether this "offer" can be attributed to the plaintiffs. Plaintiffs

argue that the concept of "concerted action" supports this conclusion, and that 29 USC 159(a) mandates it.

> Exclusive representatives; employees' adjustment of grievances directly with employer. Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, *shall be the exclusive representatives of all the employees* in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment . . . . [Emphasis added.]

This provision directs the employer to bargain only with the majority representative; he cannot bargain with individual employees. In essence, it forbids separation of the union and its members at the bargaining table.

Applying this to the case at bar, we conclude that the union's "offer to return" should be attributed to the individual employees.[15] In the absence of any evidence indicating plaintiffs' desire to separate themselves from the union's position, the union's offer should be deemed an offer by each member.

Accordingly, we must now determine whether the "offer" established plaintiffs' willingness to return to work, so that a rejection by the employer would transform plaintiffs into involuntary strikers.

In order to establish that plaintiffs were willing to return, they must show that they would have accepted any reasonable offer of favored work put

---

[15] This is supported by the fact that, in applying for reinstatement, a striking worker need not make an individual request. The request may come from the union on behalf of a group of employees. *Trinity Valley Iron & Steel Co v NLRB,* 410 F2d 1161 (CA 5, 1969).

forth by Cadillac.[16] A conditional "offer" to return
does not operate to transform strikers into invol-
untary strikers; rather, it represents a reposition-
ing of the union with regard to its demands and
concessions.[17] An analogy to employer liability for
backpay to a striking worker is instructive on this
issue.

In general, an employer is not obligated to a

[16] See *Pigue, supra* (an injured employee who refuses an offer of
favored work that the employee is physically capable of performing is
not entitled to wage loss benefits).

[17] Plaintiffs have advanced a similar argument with respect to their
December 4, 1981, proposal, in which the union offered to return to
work under the same terms that existed in the expired contract.
Plaintiffs argue that in light of *Pigue,* this proposal compels a re-
sumption of benefits. The *Pigue* Court reasoned:

> In the case at bar *plaintiff could have continued his employ-
> ment under the same terms and conditions as existed prior to
> going out on strike.* The incapacity of plaintiff to earn wages
> during this period was not occasioned by his previous injury,
> but by the intervention of a labor union of which he was a
> member. Employment for plaintiff was available under condi-
> tions existing prior to the strike. Plaintiff is thus in the position
> of having refused employment until those conditions were
> modified. Plaintiffs' employment did not cease by reason of any
> overt act upon the part of his employer or because of his
> inability to work by reason of his accidental injury. [*Id.* at 318.
> Emphasis added.]

We are not persuaded by plaintiffs' argument.

There is no support for plaintiffs' implicit contention that "terms
and conditions" as used in *Pigue* refers to wages, hours, and condi-
tions of employment, which are essentially the mandatory subjects of
collective bargaining. *Pigue* failed to define what it meant by such
"terms and conditions." Thus, its meaning must be determined from
the context in which the case arose, namely, a labor dispute.

To hold that it refers to wages, hours, and conditions of employ-
ment existing at the time of the strike would be tantamount to
imposing worker's compensation liability on any employer whose
expired collective bargaining contract resulted in a strike, where the
employer refused to agree to a contract with the same "terms and
conditions." In essence, it would preclude the employer from negotiat-
ing a more favorable contract without having to compensate striking
workers.

We conclude that "terms and conditions" refers to the nature of the
work, namely, the clerical work at issue in *Pigue* or the favored work
at issue in the case at bar.

striking employee for backpay. The exception to this rule arises when the striking worker submits an unconditional application for reinstatement to his job that the employer rejects. The employer's refusal to reinstate the worker triggers the accrual of backpay, beginning after the denial of the striking employee's request for reinstatement.[18]

Applying this to the case at bar, it is clear that an unconditional offer would have demonstrated plaintiffs' willingness to return to work. An offer conditioned upon the employer's acceptance of certain terms does not.

The WCAB concluded that the January 18, 1982, "offer to return" was nothing more than "another proposal in a very lengthy series of negotiations."[19] Support for this conclusion was found in the facts that this "offer" attempted to accept an offer that had been expressly withdrawn, the union's "offer" was not in writing, as had been the practice, and the union members had not voted to ratify such a proposal.

We agree with the WCAB's analysis of the "offer" and conclude that plaintiffs' "offer to return" was merely another proposal in the negotiation process. The "offer" did not rise to the level of the unconditional offer necessary to establish the requisite willingness to return, thereby transforming plaintiffs into involuntary strikers. Hence, it should not serve to terminate the suspension of benefits.

C

Additionally, plaintiffs argue that Cadillac's announcement of its intention to hire permanent replacement workers had the effect of withdrawing

[18] See Gorman, Labor Law, ch 17, § 6, p 348.
[19] 1989 WCABO 239, 256.

its offer of favored work from its striking employees, thus entitling the plaintiffs to a resumption of benefits. We disagree.

The announcement by management of the use of permanent replacements has considerable effect on the dynamics of a labor dispute, particularly in view of the fact that to a striking worker, it represents a threat not only to the benefits sought by the union, but also introduces the possibility of permanent job loss. The effect on a favored-work striker, however, is quite different. Such an employee, at most, sees a loss of favored work, which, in turn, may result in a resumption of work loss benefits without the need to perform favored work.[20] While favored-work strikers certainly should not be disadvantaged by the outcome of the use of permanent replacements, they also should not improve their position as a result of the use of replacement workers.

Therefore, in view of the divergent effects of the use of permanent replacements on injured versus noninjured striking employees, we think that the rules for placing the burden of establishing a readiness to offer or accept favored work should be the same as would obtain had there been a voluntary cessation of favored work outside a labor dispute;[21] we do not believe the hiring of replacement workers during a labor dispute should operate to shift this burden.[22]

[20] See *Kolenko v United States Rubber Products, Inc,* 285 Mich 159; 280 NW 148 (1938) (an employer must prove that it offered the injured employee work that the employee could perform; the employer's inability to meet this burden results in an award of benefits to the employee).

[21] The rule, as stated above, is that the party refusing favored work bears the burden of proving the expression of a willingness to perform such work. Such willingness must be expressed within a reasonable period of time.

[22] Furthermore, it would be a rare occasion when there would be a sufficient number of favored-work striking employees as a percentage

Accordingly, we reject plaintiffs' argument that Cadillac's announcement of its intention to hire permanent replacement workers operated to withdraw its offer of favored work and trigger the resumption of benefits.[23] The announcement of permanent replacements was preceded by plaintiffs' refusal to accept favored work; the permanent replacements were not the cause of the cessation of favored work.[24] Furthermore, because the employees did not offer to return to work at anytime before the commencement of this action, we need not undertake a determination of what other circumstances could serve to restore benefits following an offer to return.[25]

We conclude that plaintiffs failed to indicate individually or collectively an unconditional offer to return to their favored work either during the strike or when it was announced that their jobs would be filled by permanent replacements.[26] Ac-

of the total number of striking employees to affect the dynamics of a labor dispute.

[23] In her opinion, Justice BOYLE characterizes the majority's conclusion as being that "as a matter of law, the hiring of permanent replacement workers cannot serve as a withdrawal of favored work." *Post* at 259. Our holding, however, is that the hiring of replacement workers, *without more,* cannot serve as a withdrawal of favored work. As we attempt to make clear in the following footnote, the hiring of permanent replacement workers *in conjunction with* an employer's refusal of an employee's offer to return to work *may* operate as a withdrawal of favored work, thereby triggering the resumption of benefits.

[24] The opinion of Justice BOYLE states that "the striking workers in this case may well have viewed permanent replacement workers as eliminating their positions . . . ." *Post* at 262. The workers did not, nor do we, have to speculate; they needed only to make known that they wished to return to their favored work positions. If this offer were declined, it would then be possible to determine whether the employer had kept the positions open for a reasonable period.

[25] Specifically, we need not address the question whether the employees' offer to return was expressed within a reasonable time, in light of our determination that the employees never offered to return to work at anytime before the commencement of this action.

[26] Nor is there any indication that they have subsequently requested reinstatement.

cordingly, at least plaintiff Nederhood was without recourse to collect work loss benefits.

IV

In *Zimmerman,* we must address the additional issue whether a supervening, non-work-related heart attack operates to reinstate plaintiff's right to benefits. We conclude that it does.

As we have previously stated, the general rule is that an injured employee who refuses an offer of favored work that the employee is physically capable of performing is not entitled to worker's compensation benefits. See *Pigue, supra* at 318-319. A corollary to this rule is the supervening events rule, which states that a supervening event causing cessation of favored work will terminate an employee's right to benefits if the supervening event either is within the employee's control or is attributable to him. *Bower, supra* at 188. Applying these rules to plaintiff Zimmerman, it is undisputed that after his heart attack, he was no longer physically capable of performing his favored work. Under the physically capable rule, Zimmerman would be entitled to benefits.[27] But the supervening events rule is also applicable to Zimmerman because the strike was a voluntary action on his part. Under that rule, Zimmerman would not be entitled to benefits. Because a different result is reached under each rule, they must be reconciled.

As a preliminary matter, we note that in *Powell v Casco Nelmor Corp,* 406 Mich 332; 279 NW2d 769 (1979), this Court held that the inability of a worker to continue favored work does not preclude

---

[27] We think the dissent misreads our opinion when it states that we misconstrue the supervening events doctrine in granting Zimmerman a windfall. *Post* at 273-274. As our opinion makes clear, we are not granting Zimmerman relief on the basis of the supervening events doctrine.

the payment of benefits where that inability was occasioned by a supervening non-work-related injury beyond the employee's control. However, we note that in *Powell,* unlike the facts in this case, the injured employee was performing favored work at the time of the supervening, non-work-related injury.

In deciding this issue, we again must bear in mind the remedial nature of the Worker's Disability Compensation Act. It should be construed liberally so as not to unnecessarily deny benefits. When we are dealing with an issue of benefits, we must favor an interpretation that awards, rather than denies, benefits.

We must also consider the extent and circumstances of the disability. Zimmerman's heart attack has rendered him totally disabled. We are not presented with a case of partial disability that may have little or no effect on the future employment prospects of an employee. We are faced with a situation in which the employee's injury may prevent him from obtaining any further employment. A denial of benefits in this case would work an unquestionable hardship.

Consideration should also be given to the extent of the refusal to perform favored work. In general, a refusal to perform favored work predicated upon participation in a strike is not viewed as a permanent refusal. In contrast, we can envisage other cases where the original refusal will be of a more permanent nature.[28] The fact that this refusal was not intended to be of a permanent nature counsels against a denial of benefits where there is a subsequent non-work-related disability.

---

[28] For example, we can conceive of a situation in which an injured employee refuses favored work and then moves to another state or country. The permanent nature of this refusal would weigh heavily against a plaintiff seeking benefits upon the occurrence of a supervening, non-work-related injury.

Finally, we note that the heart attack did not arise out of the refusal to perform favored work. This is not the case where a striking employee suffered injuries while picketing. The heart attack here was unrelated both to the work and to the strike and did not stem from the refusal to perform favored work.

On the basis of these considerations, we would hold that the occurrence of plaintiff's heart attack while on strike does not preclude the recovery of wage loss benefits. In reaching this conclusion, we have considered the remedial nature of worker's compensation, the certainty and extent of the total disability, the length of the refusal to perform favored work at the time of the heart attack,[29] and the fact that Zimmerman's heart attack did not arise out of his refusal to perform favored work; it was a supervening event neither within his control nor attributable to him. We note that a contrary result would require a permanent forfeiture of benefits on the basis of his original cessation of favored work, a consequence we have rejected today. For the foregoing reasons, we would hold that Zimmerman is entitled to wage loss benefits as of February 4, 1982, the date upon which his heart attack rendered him physically unable to perform favored work.[30]

## CONCLUSION

We would hold that a voluntary cessation of favored work by a striking employee results in a

[29] We caution that in a case presenting a longstanding refusal of favored work, and an injury less certain or pronounced, we would place more weight on the refusal of favored work and less weight on the physical inability to perform work.

[30] While the dissent's position on the effects of Zimmerman's heart attack is certainly defensible in view of the lack of authority on point, we remain convinced that Zimmerman should receive benefits in light of the reasons stated above and the remedial nature of the act.

suspension of wage loss benefits. Neither a conditional offer to return by a worker's union nor the hiring of permanent replacement workers by the employer operates to automatically restore benefits to the striking employee. However, benefits will be restored once the employee expresses a good-faith willingness to return to favored work, provided such willingness is communicated to the employer within a reasonable period following the cessation of favored work. Additionally, we would hold that the resumption of such an employee's right to benefits upon the occasion of a supervening heart attack that renders such employee totally disabled depends on the certainty and extent of the injury, the length of the refusal to perform favored work before the injury, and the lack of a causal nexus between the refusal of favored work and the resulting heart attack.

Accordingly, we would affirm the decisions of the WCAB and the Court of Appeals with respect to their findings that the plaintiffs have not established the requisite willingness to perform favored work and are therefore not entitled to wage loss benefits from the commencement of the strike. We would reverse the decisions with respect to Zimmerman, who is entitled to work loss benefits from the time of his totally disabling heart attack.

BOYLE, J. (*concurring in part and dissenting in part*). I concur in the reasoning and result of parts I and II of the lead opinion and in the result in part IV. I write separately for two reasons.

I disagree with the conclusion of the lead opinion that, as a matter of law, the hiring of permanent replacement workers cannot serve as a withdrawal of favored work. I would hold that the hiring of permanent replacement workers may in fact and in law work to withdraw an employer's

offer of favored work. Therefore, I would remand
for further proceedings consistent with this opin-
ion. I disagree with reaching and disposing of an
issue not properly before this Court, namely, the
adoption of a reasonable time limitation on an
employee's ability to reestablish his right to fa-
vored work. The reach is unwarranted, and, in my
view, the rule suggested is unjustified. If there is a
justification for a rule that appears to provide an
incentive to employers either to delay the settle-
ment of a strike or to hire permanent replacement
workers, it has not here been made by the em-
ployer, and the lead opinion should not provide it.

I

In March 1982, four months after the strike
began, Cadillac Malleable acknowledged that the
replacement workers it had been hiring were per-
manent. The employees who had been on favored
work before the strike may have viewed Cadillac's
announcement as a revocation of favored work
positions. If a revocation could be proven to have
occurred, the employees would be entitled to re-
sumption of benefits because the justification for
the suspension (voluntary cessation from available
favored work) would cease to exist. *Ante* at 254;
*Kolenko v United States Rubber Products, Inc,* 285
Mich 159; 280 NW 148 (1938). Nonfavored-worker
strikers are presumed to be unemployed following
the employment of permanent replacements.
*Plymouth Stamping v Lipshu,* 436 Mich 1; 461
NW2d 859 (1990). The lead opinion distinguishes
favored-worker strikers from other strikers be-
cause the employer either must pay benefits or
employ the worker within restrictions. From this
distinction the lead opinion concludes that "the
rules for placing the burden of establishing a

readiness to offer or accept favored work should be the same as would obtain had there been a voluntary cessation of favored work outside a labor dispute . . . ." *Ante* at 254. Put plainly, the lead opinion would hold that the burden is on the employee to offer to return to work.

While the lead opinion is correct in its assertion that the effect on favored-worker strikers and nonfavored-worker strikers of hiring permanent replacements is not identical, I do not agree with its conclusion that, as a matter of law, the hiring of such workers can never serve as a de facto withdrawal of the employer's offer of favored work. It is true that the threat to the latter worker is to the benefits sought by the union and to the possibility of permanent job loss. The threat to the favored worker, however, as this case illustrates, is the elimination of both the worker's job and benefits until such time as it is definitively determined that the strike is over or a reasonable time has passed.[1] Where, as here, there is a relatively high concentration of favored workers in the work force and the labor dispute is protracted, the proposed holding of the lead opinion, when combined with the reasonable time limitation, would improve the employers' bargaining leverage or encourage extension of the labor dispute and strikebreaking.

In *Plymouth Stamping v Lipshu,* the question was whether the labor disqualification provision of the Michigan Employment Security Act, MCL 421.29(8); MSA 17.531(8), applied to striking workers who had been permanently replaced. In a plurality opinion, four members of the Court held "that any striker who is permanently replaced is thereby entitled to benefits from that time forward

[1] See part II.

unless and until some succeeding event again
renders the labor dispute a substantial contribut-
ing cause of the unemployment." *Id.* at 42 (opinion
of Boyle and Cavanagh, JJ., concurring). My own
view was that

> [t]he fundamental assumption of the labor dispute
> disqualification provision is that there exists a job
> from which the striking employee has voluntarily
> absented himself because of a labor dispute and to
> which he will return at the end of that dispute.
> When, however, the striking employee is notified
> that his position has been filled—that he has been
> permanently replaced by another employee—that
> assumption no longer obtains. In the language of
> the statute, once the striker has been permanently
> replaced, his unemployment ceases to be "due to"
> the strike. At that juncture, the *only* "substantial
> contributing cause" [citations omitted] of the strik-
> er's unemployment is his permanent replacement.
> [*Id.* at 38.]

Like the workers in *Lipshu,* the striking workers
in this case may well have viewed permanent
replacement workers as eliminating their posi-
tions, and the cause of the injured employees'
failure to perform favored work might have been
not a voluntary refusal, but a corporate revoca-
tion. While the nature of a favored work position
might make this supposition more or less tenable,[2]
the fact that some favored workers could reason-
ably view the hiring of permanent replacements as
the end of their employment counsels against
adoption of the rule suggested by the lead opinion,
which would require these employees to attempt to
return to jobs they believe are no longer available.

[2] For instance, odd-lot jobs would seem to be less likely to be filled
by permanent replacements. Conversely, jobs that happen to fall
within a favored worker's restrictions, but would exist absent that
particular favored worker, seem more likely to be filled by a perma-
nent replacement.

Mere reliance on the possible availability of benefits if the offer of favored work is eliminated does not justify placing a burden on the plaintiff to return to the employer asking for favored work. In my view, it is reasonable to conclude that, if the employer can be shown to have revoked its offer of favored work with the hiring of permanent replacements, then, as in *Lipshu,* the cause of a worker's unemployment is no longer due to the strike.[3]

What is not clear in this case is whether Cadillac's act of hiring permanent replacement workers served to withdraw its offer of favored work. The WCAB held that the hiring of replacement workers was not a de facto withdrawal of favored work. However, it did not have the benefit of the *Lipshu* analysis.[4] Moreover, it is not obvious from the opinion whether the board understood that the hiring of permanent replacements *could* serve to withdraw an offer of favored work. Although the board may have considered the possibility and rejected it, such a decision is not explicit in the WCAB's opinion. The WCAB also seemed to place the

---

[3] See *Liberty Mutual Ins Co v Neal,* 140 Ga App 585; 231 SE2d 574 (1976), and *Coats & Clark, Inc v Thompson,* 166 Ga App 669; 305 SE2d 415 (1983), for the proposition "that the fact of the job's becoming unavailable has the effect in itself of stopping the suspension, on the theory that the reason for claimant's unemployment from that point on is no longer his refusal of the job but its unavailability." 1C Larson, Workmen's Compensation, § 57.66(c), p 10-492.76.

[4] The WCAB held:

> We do not find the hiring of replacement workers to constitute a de facto withdrawal of the offer of favored work. Mr. Weikel testified that there were approximately 80 members of the bargaining unit in the plant when the strike was called. Only 41 or 42 of those employees had been replaced by replacement workers as of the hearing in this matter, held in March 1983. There was no showing that plaintiff's job had been filled by a replacement worker or that it was unavailable to him for any other reason, such as relocation of the plant . . . . [1989 WCABO 471, 487.]

burden of coming forward and the burden of proof on the plaintiff. It is likewise unclear where the burden would have been placed had it been understood that this Court would recognize application of the *Lipshu* analysis to the striking favored-work employee.

In the absence of a full evaluation by the administrative agency charged with implementing worker's compensation law,[5] it is inappropriate to resolve the question whether the hiring of permanent replacement workers ended plaintiff's voluntary refusal to perform favored work. While I acknowledge again that the analogy between worker's compensation benefits and unemployment benefits is not perfect, the permanent replacement issue is so important that the Court should not act without a full record development and discussion of the rationale and effect of the holding of *Lipshu* on favored workers on strike.

I would vacate the decision of the Worker's Compensation Appeal Board and remand this case to the Worker's Compensation Appellate Commission to assign the case to a magistrate for further consideration consistent with this opinion. On remand, the magistrate should be directed to consider the existing record and be authorized, with-

---

[5] This Court accords "deference to the ' "construction placed upon statutory provisions by any particular department of government for a long period of time . . . ." ' " *Ludington Service Corp v Acting Comm'r of Ins,* 444 Mich 481, 491; 511 NW2d 661 (1994). See also *Owosso Union School Dist Bd of Ed v Goodrich,* 208 Mich 646, 652; 175 NW 1009 (1920):

While not controlling, the practical construction given to doubtful or obscure laws in their administration by public officers and departments with a duty to perform under them is taken note of by the courts as an aiding element to be given weight in construing such laws, and is sometimes deferred to when not in conflict with the indicated spirit and purpose of the legislature.

out limitation, to consider any motions by the parties concerning the possible submission of additional proofs.

II

The lead opinion observes that an employee's willingness to return to work "should be expressed within a reasonable period in order to be effective." *Ante* at 250. Because it does not decide whether a reasonable time has passed in this case, *ante* at 255, n 25,[6] the discussion of a reasonable time limitation is dicta. While it is unnecessary to address this question in today's opinion,[7] because it is discussed, I state my opposition to the adoption of the reasonable time limitation formulated by the lead opinion.

Favored work is a judicially created doctrine, "[t]he primary purpose" of which is to allow an employer the opportunity to reduce work-loss damages by putting a partially disabled employee back to work. *Bower v Whitehall Leather Co,* 412 Mich 172, 182; 312 NW2d 640 (1981). The favored work doctrine also "encourages the employee to return to productive employment rather than to remain idle, thus also serving a rehabilitative function." *Id.* However, the rehabilitative function is merely incidental, with each employer deciding whether to offer an individual employee favored work. Whether an employee will have the opportunity to rehabilitate is a decision left to his employer. In any event, the employer owes an employee the same minimum level of compensation whether he performs favored work or remains at home.

[6] The WCAB held that "[p]laintiff's refusal of favored work continued through the date of hearing, thus no benefits are ordered." 1989 WCABO 471, 488.

[7] This issue was not addressed in the grant order in either case.

It is therefore surprising that the lead opinion would determine that "fairness," *ante* at 250, requires the adoption of the reasonable time limitation. Fairness is not offended when the employee takes away an employer's ability to reduce worker's compensation losses that do not exist. While the worker refuses favored work, the employer is relieved of its obligation to pay that employee. There are no damages to mitigate. Fairness is also not offended by the employee's loss of an opportunity to rehabilitate. With rehabilitation existing at the discretion of an employer who is under no obligation to offer favored work, it can hardly be argued that the desire to rehabilitate injured workers justifies cutting off future rights to worker's compensation benefits or favored work.

The only remaining justification is a generalized concern that it is somehow unfair to require employers "to hold favored positions open indefinitely." *Ante* at 250. However, the nature of favored work itself, as described by Cadillac Malleable's attorney at oral argument, provides the clearest rejoinder to this argument:

—By its very nature, favored work is work outside or different from the work that is offered to the general work force. It is work created or established by the employer to accommodate an injured employee's limitation. It can be an ordinary job that has been assigned the employee to accommodate his limitations.

—The question here is not whether plaintiffs' favored work was replaced, because preferred favored work could not have been replaced. It was especially established to accommodate the injured worker.[8]

Under the current system, an employer is re-

---

[8] See Welch, Worker's Compensation in Michigan: Law & Practice (rev ed), § 10.11, p 10-14.

quired to pay an injured employee worker's compensation if it does not offer a favored work position within the employee's limitations. *Bower, supra* at 182. If such an offer is made, the employee is required to accept it or face discontinuation of benefits. Consequently, when an employee fails to avail himself of favored work, the employer gains because it is relieved of the obligation either to pay that employee his worker's compensation benefits or to offer him favored work. For instance, when an injured employee does not present himself to his employer for ten years, the employer gains because he was relieved of an obligation to pay owed benefits or offer favored work for that period. The "reasonable time" limitation would present employers with a windfall by turning a judicially created doctrine of mitigation into a judicially created doctrine of benefit elimination.[9]

CAVANAGH, C.J., and MALLETT, J., concurred with BOYLE, J.

RILEY, J. (*concurring in part and dissenting in part*). I join in the reasoning and holdings of parts I-III of the lead opinion. However, because I find that a striking favored worker fully disabled by a supervening event is not entitled to a reinstatement of benefits unless he shows that he would have returned to work but for the supervening event, I write separately.

I

The purpose of the worker's compensation act

---

[9] Although I disagree with the reasonable time limitation rule suggested by the lead opinion, I would not foreclose consideration of appropriate circumstances in which it might be found that an employee had forfeited his right to reapply for favored work or benefits. This issue is not before us.

"is to provide compensation for disability resulting from an occupational injury." *Lynch v Briggs Mfg Co,* 329 Mich 168, 171; 45 NW2d 20 (1950). In furtherance of this basic policy, this Court crafted the favored work doctrine, which permits an employer to offer a partially disabled employee work that he is physically capable of performing (at equal or greater preinjury wages) in lieu of providing worker's compensation benefits. *Hood v Wyandotte Oil & Fat Co,* 272 Mich 190, 193; 261 NW 295 (1935); *Bower v Whitehall Leather Co,* 412 Mich 172, 182; 312 NW2d 640 (1981).[1]

> The primary purpose of the doctrine is that of mitigation. It allows an employer to reduce or completely eliminate compensation payments by providing work within the injured employee's physical capacity. At the same time, it encourages the employee to return to productive employment rather than to remain idle, thus also serving a rehabilitative function.[2]

In accordance with the principles of mitigation, "if physically able to perform the favored work"

---

[1] The favored-work doctrine is a purely judicial creation. Favored, or light, work can be loosely defined as less strenuous post-injury work. Wages from favored-work may be used as a setoff against an employer's compensation liability, MCL 418.361(1); MSA 17.237(361)(1), but favored-work wages do not establish an earning capacity, and when such wages cease, they neither suspend nor bar compensation. *Powell v Casco Nelmor Corp,* 406 Mich 332; 279 NW2d 769 (1979).

[2] The rehabilitation function of the favored work doctrine should not be forgotten, for "[i]n many instances from the highest motives of desire to rehabilitate the employee and restore him as a wage-earning member of society, some employers have retained injured employees in new jobs within their capacity to perform." *Pulley v Detroit Engineering & Machine Co,* 378 Mich 418, 423; 145 NW2d 40 (1966). Even without such high motives, favored work fosters rehabilitation by encouraging partially disabled persons to reintegrate into the workplace.

an employee may not refuse such work and still be awarded compensation. *Lynch, supra* at 172.[3]

Thus, a favored work employee who refuses to perform favored work because of his participation in a strike forfeits his right to compensation. *Pigue v General Motors Corp,* 317 Mich 311; 26 NW2d 900 (1947). The *Pigue* Court explained:

> In the case at bar plaintiff could have continued his employment under the same terms and condi-

---

[3] The favored work doctrine is nothing more than the logical application of the axiomatic principle of mitigation to the worker's compensation scheme. As Justice CAMPBELL noted, "[i]t has always been considered incumbent upon any person subjected to injury to use such means as are reasonably in his power to make the evil consequences as light as possible." *Chandler v Allison,* 10 Mich 460, 474-475 (1862). See also *Cubit v O'Dett,* 51 Mich 347, 350; 16 NW 679 (1883). A failure to mitigate by the injured party bars recovery, therefore, " 'for any item of damage which could thus have been avoided.' " *Shiffer v Gibralter School Dist Bd of Ed,* 393 Mich 190, 197; 224 NW2d 255 (1974), quoting McCormick, Damages, § 33, p 127 (emphasis omitted).

> The principle of mitigation is a thread permeating the entire jurisprudence. It is not solely a "breach of contract" or "commercial" doctrine; it is part of the much broader principle of "avoidable consequences." [*Shiffer, supra* at 197.]

> The rights protected by the mitigation doctrine are not just those of contracting parties, commercial litigants, tort victims or tortfeasors but, rather, the rights of all society: "Legal rules and doctrines are designed not only to prevent and repair individual loss and injustice, but to protect and conserve the economic welfare and prosperity of the whole community." [*Id.* at 198, quoting McCormick, *supra.*]

Hence, mitigation is fully applicable in the employment context. See, e.g., *McClelland v Climax Hosiery Mills,* 252 NY 347, 358; 169 NE 605 (1930) (Cardozo, C.J., concurring) ("The obligation of the master is merely to pay whatever damages have actually been suffered, and these exclude damages that a servant, acting reasonably, would have diminished or avoided"). In the favored worker context, therefore, "interruptions of work caused by voluntary actions of the employee, such as abandonment of work to participate in a strike, failure to return without explanation at the end of a leave of absence, failure to notify the employer of medical restrictions, or discharge because of gambling or drunkenness, results in a forfeiture of benefits." *Bower, supra* at 188 (citations omitted).

tions as existed prior to going out on strike. The incapacity of plaintiff to earn wages during this period was not occasioned by his previous injury, but by the intervention of a labor union of which he was a member. Employment for plaintiff was available under conditions existing prior to the strike. Plaintiff is thus in the position of having refused employment until those conditions were modified. Plaintiff's employment did not cease by reason of any overt act upon the part of his employer or because of his inability to work by reason of his accidental injury.

Decision in this case is based upon the fact that work was available to plaintiff by his employer; that plaintiff was physically able to perform such work, but declined to do so because of a strike called by a labor union of which he was a member. [*Id.* at 318-319.]

The lead opinion would hold that this forfeiture of benefits during a strike is only a "temporary suspension of benefits" during the refusal to work. *Ante* at 248. It also would find that if a worker fails to request or accept an offer of favored work within a reasonable time, the forfeiture of benefits becomes permanent. *Ante* at 250, 255. This is so because "[a]n employer should not have to continuously bear the burden of initiating a renewal of favored work, nor should the employer be forced to hold favored positions open indefinitely." *Ante* at 250. Hence, the lead opinion correctly concludes "that an employee who has ceased to perform existing favored work should establish a good-faith willingness to accept or resume favored work that remains available in order to restore eligibility for benefits. Additionally, this willingness should be expressed within a reasonable period in order to be effective." *Ante* at 250. I agree.

Furthermore, as recognized by the lead opinion, the reasonableness standard must apply to both

parties to maintain the integrity of the favored work doctrine. *Ante* at 248-250, 254. See also *Bower, supra* at 182-185; *Russell v General Motors Corp,* 172 Mich App 627, 632; 432 NW2d 738 (1988).[4] Hence, a favored employee's unreasonable delay in accepting an offer of employment relieves an employer of liability. See, e.g., *Russell, supra* at 632.[5]

---

[4] A reasonableness test is applied to the actions of employees when determining whether they are entitled to worker's compensation benefits. *Bower, supra* at 182. Originally, this Court adopted the reasonableness doctrine to protect workers from unjust results in the context of the favored work doctrine:

> Forfeiture is a drastic remedy. If the statute specifically requires that reasonableness not be taken into account, the courts must obey, no matter how unjust the result. But in the instant case, the doctrine to be applied, even though developed in a statutory context, is a judicially created one. Therefore, consistent with our approach to the common law, we refuse to consider application of the harsh forfeiture penalty without an assessment of the parties' reasonableness. [*Id.* at 184.]

The Court of Appeals has divided over whether the reasonableness standard applies to the actions of employers. See, e.g., *Hartsell v Richmond Lumber Co,* 154 Mich App 523, 535-536; 398 NW2d 456 (1986) (holding that the reasonableness standard is inapplicable); *id.* (MACKENZIE, P.J., dissenting) (approving of reasonableness standard for an employer's conduct); *Russell, supra* at 632, and *Derr v Murphy Motor Freight Lines,* 195 Mich App 333, 335; 489 NW2d 183 (1992) (holding that the reasonableness of an employer's actions should be evaluated).

The better view is to apply the reasonableness standard to the actions of employers:

> It must be remembered that it is the employee's unreasonable refusal which triggers the initial forfeiture of benefits. There comes a point after which it is unreasonable to think that such employee might someday accept the offer that was originally spurned. It is at that point that a company should be permitted to withdraw its offer with no fear of disadvantage. [*Russell, supra* at 632.]

[5] The obvious [corollary] to [*Bower*] is that the reasonableness of an employer's withdrawal of an offer of favored work must also be considered in determining whether benefits should be awarded. I fail to see how the mitigation or rehabilitation purposes underlying the favored work doctrine are served by

In the instant case, the application of these principles denies Nederhood relief. Although this Court may examine the WCAB's findings of law, absent fraud its findings of fact are conclusive if any competent evidence on the record supports those findings. Const 1963, art 6, § 28; MCL 418.861; MSA 17.237(861).[6] The WCAB found that Nederhood was performing favored work and voluntarily left that work to participate in the strike. The WCAB also found that defendant's hiring of permanent replacement workers did not constitute a de facto withdrawal of its offer of favored work, and that the union's proposals to return to work were merely negotiating tactics, not bona fide offers to return. Similarly, Nederhood failed to show that a replacement worker had taken his job, or that he could not find employment as a replacement worker. To the contrary, the record reveals that several former union members became replacement workers.[7] Moveover, most important, the WCAB found that Nederhood never approached defendant to regain his job—in other words, he failed to tender an offer to accept a favored posi-

deciding, as the majority does, that an offer of favored work must be left open without limit even though, as here, the worker has clearly demonstrated utter disinterest in returning to his employer's workplace. [*Hartsell,* n 4 *supra* at 535-536 (MACKENZIE, J., dissenting).]

[6] " 'We do not weigh the evidence. The weighing scale is in other hands and, even if we think it out of balance, we cannot re-weigh.' " *Pulley, supra* at 424, quoting *Hood, supra* at 194. See also *Holden v Ford Motor Co,* 439 Mich 257, 262-263; 484 NW2d 227 (1992); *Thornton v Luria-Dumes Co-Venture,* 347 Mich 160, 162; 79 NW2d 457 (1956).

[7] Furthermore, because many different positions may constitute favored work, see, e.g., *Markey v SS Peter & Paul's Parish,* 281 Mich 292, 299-300; 274 NW 797 (1937) (noting that odd-lot work may be favored work); *Evans v United States Rubber Co,* 379 Mich 457, 465-466; 152 NW2d 641 (1967) (noting that an ordinary job regularly performed by healthy individuals may be favored work), an alteration in job classifications may not have affected his ability to obtain favored work.

tion once he voluntarily left favored work. In short, Nederhood failed to present a prima facie case. Thus, the lead opinion would appropriately deny Nederhood relief.

II

Like Nederhood, Zimmerman forfeited his entitlement to benefits when he participated in the strike. Zimmerman failed to show any evidence that he or the union ever offered to return to favored work. Again, like Nederhood, Zimmerman also failed to present any evidence showing that his position was taken by a replacement worker, or that he would have been unable to obtain another comparable position. Hence, Zimmerman is not entitled to benefits.

Nevertheless, considering the "remedial nature of worker's compensation, the certainty and extent of the total disability, the length of the refusal to perform favored work at the time of the heart attack, and the fact that Zimmerman's heart attack did not arise out of his refusal to perform favored work [and] that a contrary result would require a permanent forfeiture of benefits on the basis of his original cessation of favored work," without providing him a reasonable time within which to express his willingness to return, the lead opinion would hold that he is "entitled to wage loss benefits as of February 4, 1982, the date upon which his heart attack rendered him physically unable to perform favored work." *Ante* at 258.

The lead opinion's holding misconstrues the supervening event doctrine and the worker's compensation act by granting Zimmerman a windfall. It correctly notes that the "basic rule of law . . . is that a supervening event causing cessation of an employee's favored work will not

terminate his right to benefits as long as the event is not under the employee's control or attributable to him." *Bower, supra* at 187. This is so because " '[a]n independent, intervening event, which follows a personal injury arising out of and in the course of employment, does not alone justify the denial, suspension, reduction, or *increase* of disability benefits for a continuing work related injury.' " *Powell v Casco Nelmor Corp,* 406 Mich 332, 354-355; 279 NW2d 769 (1979) (citation omitted; emphasis added). Hence, the favored work doctrine does "not require compensation benefits to be *automatically* revived upon the happening of an intervening nonindustrial event which disables a favored-work employee . . . . Rather, . . . such an event [does] not *preclude* the payment of compensation for a prior injury." *Flynn v General Motors Corp,* 162 Mich App 511, 517; 413 NW2d 444 (1987). Thus, to obtain benefits under the supervening act doctrine, a claimant must show that he "was already performing favored work for his original employer and a supervening independent event rendered him unable to continue." *Bower, supra* at 187.[8]

Zimmerman, however, was not performing favored work when he suffered the heart attack, but was voluntarily participating in a strike. There is no evidence that Zimmerman would have crossed the picket line had he been healthy, and a legal bar denied Zimmerman benefits at the time of his disability. This Court, therefore, must assume that even without the heart attack he would not have worked for defendant while the strike continued. Furthermore, he has failed to present any evidence that he would have returned to his position

---

[8] In other words, "the employee was already performing favored work for his original employer and a supervening independent event rendered him unable to continue." *Id.* See also *Lynch, supra* at 172.

after the decertification of the union. Thus, Zimmerman's disability is irrelevant to his ability to receive benefits because he would have been ineligible for such benefits if he had not had the heart attack. Because the burden is upon Zimmerman to show that he is entitled to benefits in such circumstances, and he failed to produce any evidence that he would have returned to work despite the strike and consequent decertification of the union, Zimmerman is not entitled to benefits. *Pulley v Detroit Engineering & Machine Co,* 378 Mich 418, 425-426; 145 NW2d 40 (1966); *Flynn, supra* at 517.

On the other hand, if his union had returned to work, the WCAB or the hearing referee could have fairly assumed he would have joined the union and he would be entitled to benefits. Because the union's actions could fairly have been impugned upon Zimmerman if it had returned to work, he would have been entitled to recover benefits beginning on the day the union returned to work, but no sooner.[9] Nevertheless, this was not the case

---

[9] 29 USC 159(a) mandates that representatives of collective bargaining units are "the exclusive representative of all the employees in such unit for the purposes of collective bargaining . . . ." Hence, bargaining outside the bona fide union representatives subverts federal labor standards:

> The [National Labor Relations Act] guarantees to all employees the right to bargain collectively through their chosen representatives. Bargaining carried on by the employer directly with the employees, whether a minority or majority, who have not revoked their designation of a bargaining agent, would be subversive of the mode of collective bargaining which the statute has ordained . . . . [*Medo Photo Supply Corp v Nat'l Labor Relations Bd,* 321 US 678, 684; 64 S Ct 830; 88 L Ed 1007 (1944).]

Hence, the actions of plaintiffs' union are presumptively attributable to plaintiffs for their actions during a strike unless they in some fashion refute their union.

In the instant case, the union struck and was broken. The union never accepted a current offer of defendant, and eventually was decertified. Both Zimmerman and Nederhood were bound by their

with Zimmerman. In short, Zimmerman is not entitled to a windfall simply because of his unfortunate heart condition.

GRIFFIN, J., concurred with RILEY, J.

LEVIN, J. (*separate opinion*). I agree with the author of the lead opinion that 1981 PA 200,[1] codifying the favored work doctrine, should guide decision.[2] As set forth in that opinion, § 301(5)(a), added by the 1981 legislation, provides that if disability is established, and "an employee receives a bona fide offer of reasonable employment from a previous employer, another employer, or through the Michigan employment security commission and the employee refuses that employment without good and reasonable cause, the employee shall be considered to have voluntarily removed himself or herself from the work force and is no longer entitled to any wage loss benefits under this act during the period of such refusal."[3]

The last clause, "during the period of such refusal," is inconsistent with the view that refusal of work results in a permanent forfeiture of worker's compensation benefits. This clause is also inconsistent with the view that, because it would be unreasonable to expect the employer to keep those positions open beyond the point that it announced that the jobs would be filled by permanent replace-

union's decisions unless they chose to quit the union or cross the picket line. Neither did. Hence, they refused favored work and continue to do so. Of course, once the union was decertified, either plaintiff could have inquired regarding favored work, but failed to do so for an unreasonable length of time. Hence, they forfeited their benefits.

[1] Effective January 1, 1982.

[2] BRICKLEY, J., *ante*, p 247.

[3] MCL 418.301(5)(a); MSA 17.237(301)(5)(a).

ments,[4] Nederhood may not recover worker's compensation benefits.

While the needs of the employer may justify the employer in not keeping the offer open beyond a reasonable time, the need of the employee to participate in a strike may justify his refusal to work during a strike. The disabled worker is nevertheless disabled, and, as set forth in the 1981 legislation, can properly be denied benefits only "during the period of such refusal," without good and reasonable cause, of a bona fide offer of reasonable employment from a previous employer, another employer, or through the Michigan Employment Security Commission.

The "period of such refusal" is, of course, a question of fact. The burden of showing refusal of work should be borne by the employer because the offer of favored work is in mitigation of damages, in the form of worker's compensation benefits, otherwise payable by the employer.

When the union's representative offered to return the entire work force to work in January, 1982, that was in effect an offer on behalf of the favored workers to return to work. While the employer was not obliged to accept that offer, it should not be heard thereafter to assert that a particular injured worker, Nederhood, declined favored work unless it clarifies the situation by reoffering favored work to the injured worker, Nederhood, separately and apart from whatever was going on between the employer and the union, and other workers, at whatever wage the employer chooses to offer the particular injured worker. If the employer here had done so, and Nederhood had refused the offer, it would then be clear that, after the union's offer to return the entire work

---

[4] BRICKLEY, J., ante, p 255.

force to work in January, 1982, Nederhood had declined an offer of favored work at a definite wage.

In all events, the burden should be on the employer to show refusal of favored work from and after September 23, 1982, when Nederhood filed a petition for hearing before the Bureau of Worker's Disability Compensation. By filing that petition, Nederhood formally notified the employer that he was seeking a renewal of payment of worker's compensation benefits under the worker's compensation system. It was, or should have been, incumbent on this employer, claiming an offset in mitigation of damages on the basis of an offer, and the availability, of favored work, to show that it had, uncomplicated by the strike, the negotiations with the union, the interests of other workers (injured and uninjured), or other factors, made an offer of favored work to Nederhood after September 23, 1982, and that he had turned down the offer.

I join in reversal of the Court of Appeals in *Zimmerman.* I would also, for the reasons stated, reverse the Court of Appeals in *Nederhood* and remand to the WCAC for the entry of an award of compensation to Nederhood, who was found to have been partially disabled. Under the circumstances that three justices would affirm in *Nederhood* with the result that Nederhood would be denied compensation, and three would remand for further proceedings, and remand would provide Nederhood with an opportunity on remand to recover worker's compensation benefits, I join in remand to the WCAC.